JOHNSON, Justice.
 
 *
 

 |, This matter involves a direct appeal to this Court from a conviction of two counts of first-degree murder and one count of attempted first degree murder and a sentence of death. LSA-Const. art. V, § 5(D).
 

 On December 14, 2006, a Morehouse Parish grand jury indicted defendant, Lee Roy Odenbaugh, Jr., for the December 2, 2006 first degree murders of Jessie Mae Porter and Sondra Porter Odenbaugh and attempted first degree murder of Jessica Cooper, in violation of LSA-R.S. 14:27 and 14:80. After counsel was appointed, defendant entered pleas of not guilty.
 

 After a change in venue to Ouachita Parish, jury selection commenced on |2October 27, 2008. The trial commenced on November 3, 2008. On November 5, 2008, the jury returned the unanimous verdict of guilty as charged. After the penalty phase, the jury unanimously recommended a sentence of death for each first degree murder count, finding the offender knowingly created a risk of death or great bodily harm to more than one person, LSA-C.Cr.P. art. 905.4(A)(3). On August 14, 2009, the trial judge imposed the sentence of death in accordance with the jury’s verdict.
 

 The defendant now appeals his conviction and death sentence on the basis of thirty-six (36) assignments of error. For the reasons that follow, we affirm the conviction and sentence of the defendant.
 

 FACTS
 

 On December 2, 2006, Jessica Cooper and her grandmother, Jessie Mae Porter, drove to the trailer at 1209 Summerlin Lane in Bastrop, Louisiana, where Jessica lived with her mother, Sondra Porter Odenbaugh, and her step-father, the defendant. When they arrived, Jessie Mae confronted defendant, who was asleep in the bedroom, about work he had failed to complete at her home. An argument ensued and Jessie Mae ultimately left the home, leaving Jessica, Sondra, and defendant inside. An altercation then ensued between defendant and Jessica, who was pregnant at the time, during which defendant burned her with a cigarette. When Sondra yelled to her mother, Jessie Mae, to call the police because defendant was hitting Jessica, Jessie Mae re-entered the trailer with a golf club and swung it at defendant, striking him in the head. After a physical altercation involving everyone present in the trailer, defendant got in his truck and left the scene.
 

 1 oOfficer Chris Releford, of the Bastrop Police Department, arrived after defendant left and briefly interviewed the three women, determining there had been a domestic dispute involving the defendant. Before leaving, the officer issued a call to be on the lookout for the defendant in the area. The three women then loaded some of Sondra and Jessica’s possessions into the back of Jessie Mae’s truck in preparation to leave the residence. While Jessica was standing at the end of the driveway with defendant’s adopted daughter, Melissa Leihr, defendant returned to the scene. Jessica walked toward her grandmother’s truck as defendant pulled into the driveway and got out of his truck carrying a shotgun. Melissa grabbed defendant and tried to stop him, but could not. When she asked what he was doing, he told her that he was going to kill “these mf ers and then kill himself.” Defendant then came around the back of the truck to the driv
 
 *226
 
 er’s side where Jessie Mae Porter was sitting, and shot her. Jessica tried to run for cover behind a large tree in the yard. She turned around, at which point defendant shot her in the hip. Defendant then entered the trailer and the discharge of a gun could be heard. After exiting the trailer, defendant again pointed his gun at Jessica, but did not fire. He then fled the scene. At 12:50 p.m., Officer Releford received a call to return to the residence on Summerlin Lane. When he arrived, he saw Jessie Mae Porter, sitting in the driver’s seat of her truck with gunshot wounds to her shoulder and chest, had been killed. Jessica Cooper was approximately 30 feet in front of the truck shouting for help. After entering the trailer, Releford observed Sondra Porter lying on the floor with a gunshot wound to the chest. The officer checked for signs of life, and discovered none.
 

 Defendant was apprehended after a high-speed chase through Bastrop, during |4which he made two stops. At defendant’s first stop, near his parent’s home, he was found standing outside of his truck holding a shotgun. After a standoff with police, defendant got back into his truck and drove off. Defendant then drove to Faith Baptist Church on Cleveland Street. During this stop, defendant exited the vehicle, pointed his shotgun at himself, and threatened to kill himself. After another standoff, defendant grabbed his gun, got back into his truck, and drove off again. The officers then chased defendant to his mother’s home on Capella St., where defendant ran inside.
 

 While inside the home, defendant spoke to Lieutenant Chris Balsamo via telephone. During the conversation, defendant told Balsamo that he had just shot three people and that he was not going to jail. Defendant also told Balsamo that he wanted some cigarettes, so Balsamo promised to get him some if he would come out of the home. After some discussion, Officer Ron Lara took cigarettes to the front door of the home. When defendant opened the door, the two spoke for a moment and Lara dropped the cigarettes on the ground. As defendant tried to shut the door, Lara rushed in and tried to subdue him. With assistance from Lieutenant Balsamo and Lieutenant Scott Culp, defendant was subdued and taken into custody. At his trial, Defendant testified that the night before the shootings he and Sondra had shared a quarter ounce of cocaine and emptied defendant’s prescription bottle of Klonopin, an anti-seizure, anti-anxiety medication. Defendant estimated that he consumed “[mjaybe forty” tabs of the drug. On the following morning, the argument with Jessie Mae occurred in the kitchen of the trailer he and Sondra were renting. Defendant recalled that Jessie Mae swung at him two or three times with a six iron golf club, |fistriking him on top of his head. Defendant backed out of the kitchen into the bedroom of the trailer, retrieved the keys to his vehicle, wiped the blood off of his head with a sheet, and left the trailer, retreating to his mother’s home. Defendant recalled shooting both Jessie Mae and Jessica Cooper when he returned to his trailer. He testified that he shot Jessica after she got out of Jessie Mae Porter’s truck and appeared to be heading for the same six iron that Jessie Mae had used to continue the assault on him. It also appeared to defendant that Jessie Mae was preparing to back her truck over him, so he shot her. However, defendant did not recall walking into the trailer and firing his shotgun into the chest of his wife.
 

 PRE-TRIAL ISSUES
 

 COMPETENCY TO STAND TRIAL
 

 Defense counsel contends that the trial court failed to assess defendant’s
 
 *227
 
 competency to stand trial. Defense counsel argues that defendant was not competent to stand trial due to severe mental illness, and the trial court failed to stay the proceedings to evaluate his competency, despite reasonable grounds to do so.
 

 The Fourteenth Amendment’s Due Process Clause protects an individual’s right not to proceed to trial while legally incompetent.
 
 See, Medina v. California, 505
 
 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 853, 365-66 (1992) (quoting
 
 Drope v. Missouri,
 
 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975));
 
 Pate v. Robinson,
 
 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966). An incompetent defendant’s due process right to not stand trial does more than preserve the defendant’s rights; it protects society’s interest in the reliability of | ^criminal adjudications.
 
 See,
 
 Richard J. Bonnie,
 
 The Competence of Criminal Defendants: Beyond Dusky and Drope,
 
 47 U. Miami L.Rev. 539, 543, 552 (1993). Where a defendant with a severe mental illness is unable to meaningfully assist counsel, but is nevertheless compelled to stand trial, each of the countless decisions in which he is involved is called into question, and the reliability of the judicial proceeding is impaired.
 

 In Louisiana, the prohibition against subjecting an incompetent individual to a criminal trial “is codified in our law, which directs the suspension of criminal proceedings against one found to be mentally incompetent.”
 
 State v. Bennett, 345
 
 So.2d 1129, 1136 (1977) (on rehearing). LSA-C.Cr.P. arts. 642 and 648. Louisiana’s statutory scheme for detecting mental incapacity jealously guards a defendant’s right to a fair trial.
 
 Nomey,
 
 613 So.2d at 161. In Louisiana, “[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.” LSA-C.Cr.P. art. 641. In Louisiana, there is a presumption of sanity, and before the court is required to appoint a sanity commission, the defendant has the burden to establish his incapacity to stand trial by a clear preponderance of the evidence. See, LSA-R.S. 15:432;
 
 State v. Bridgewater,
 
 00-1529, p. 6 (La.1/15/02), 823 So.2d 877, 888;
 
 Martin,
 
 00-01489 at p. 1, 769 So.2d at 1169;
 
 State v. Armstrong,
 
 94-2950, p. 4 (La.4/8/96), 671 So.2d 307, 309. This Court has determined that the defendant bears the burden of proving by a preponderance of the evidence his incapacity to stand trial.
 
 Armstrong,
 
 94-2950 at p. 4, 671 So.2d at 309. The procedure for raising the issue of a defendant’s competency is set forth within LSA-C.Cr.P. art. 642:
 

 |7The defendant’s mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant’s mental incapacity to proceed is raised, there
 
 shall be no further steps
 
 in the criminal prosecution, except for the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
 

 According to LSA-C.Cr.P. art. 643, a court shall order a mental examination of a defendant and appoint a sanity commission when it “has reasonable ground to doubt the defendant’s mental capacity to proceed.” This Court has determined that “reasonable ground” refers “to information which, objectively considered, should reasonably raise a doubt about the defendant’s competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings’ significance, nor rationally aid his attorney in his defense.”
 
 State v. Anderson,
 
 06-2987 (La.9/9/08), 996
 

 
 *228
 
 So.2d 973, 992;
 
 State v. Snyder,
 
 98-1078 (La.4/14/99), 750 So.2d 832, 850.
 

 In evaluating the legal capacity of a criminal defendant, this Court, noting
 
 Bennett, supra,
 
 explained that the trial court’s decision regarding a defendant’s competency to stand trial “should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case, and the gravity of the decision with which the defendant is faced.”
 
 State v. Carmouche,
 
 01-0405 (La.5/14/02),872 So.2d 1020, 1039. In Louisiana, a judicial examination of a defendant’s competency has focused primarily on whether a defendant “understands the nature of the charge and can appreciate its seriousness.”
 
 See, Bennett,
 
 345 So.2d at 1138. Additionally, when a defendant’s ability to assist in preparing his defense is at issue, the following ^questions must be considered:
 

 whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
 

 Carmouche,
 
 872 So.2d at 1039
 
 (citing Bennett,
 
 supra).
 

 In the exercise of its discretion, the trial court may consider both lay and expert testimony when deciding whether reasonable grounds exist for evaluating a defendant’s competency.
 
 Martin,
 
 00-0489 at p. 2, 769 So.2d at 1169. An appellate court owes the trial court’s determinations as to the defendant’s competency great weight, and the trial court’s ruling thereon will not be disturbed on appeal absent a clear abuse of discretion.
 
 Bridgewater,
 
 00-1529 at p. 6, 823 So.2d at 888.
 

 Nevertheless, the appointment of a sanity commission is not a perfunctory matter or a ministerial duty of the trial court, and is not guaranteed to every accused in every case.
 
 State v. Volson,
 
 352 So.2d 1293, 1297 (La.1977);
 
 State v. Lott,
 
 574 So.2d 417, 424 (La.App. 2 Cir.1991),
 
 writ denied,
 
 580 So.2d 666 (La.1991). Even the fact that a defendant’s capacity to proceed is called into question by formal motion does not, for that reason alone, require an order for a mental examination. LSA-C.Cr.P. Art. 643, Offl Rev. Cmt. (a) (“The ordering of a mental examination as to the defendant’s present capacity to proceed rests in the sound discretion of the court. It is not enough that the defense has filed a motion urging the defense, but there must 19be sufficient evidence to raise a reasonable doubt as to such capacity.”).
 
 Lott, supra; State v. Goins,
 
 568 So.2d 231, 234 (La.App. 3 Cir.1990),
 
 writ denied,
 
 573 So.2d 1117 (La.1991).
 

 Failure to Order a Sanity Commission
 

 Defense counsel argues that the trial court failed to order a sanity commission even though he and the defendant consistently raised issues concerning the defendant’s incompetency to stand trial. At various pre-trial hearings, defense counsel articulated his concerns, which included: defendant’s belief that he had a chip in his brain that was implanted to surveil and punish him; a related belief that his jail cell and the attorney visiting area were “bugged” and that his attorneys
 
 *229
 
 were surreptitiously recording him; as well as hallucinations and paranoia about being haunted in jail by an apparition of the surviving victim in the case.
 

 Defense counsel suggests that the issue of a sanity commission was first raised at a hearing on July 5, 2007. At that time, defense counsel indicated that defendant would be asking for a sanity commission, to which the court responded, “... be prepared to present evidence in connection with that. Otherwise I’m going to deny it ...” While assuring the court that he would file the motion,
 
 the record shows that defense never filed the formal motion for sanity commission.
 
 However, on July 9, 2007, defense counsel did file a Motion for Psychiatric Examination, arguing that he “has reason to believe that his client may be suffering from some mental disease, injury or congenital deficiency which could render client incapable of assisting in preparing a defense and standing trial.” Defense counsel thus requested the | inappointment of a psychiatrist or psychologist to examine defendant in the More-house Parish Jail, and to report back to him with respect to whether defendant was competent to stand trial, and whether he had been sane at the time of the offense.
 

 At a hearing in October 2007, defense counsel told the court that the defendant was displaying signs of paranoid delusional behavior, specifically that he believed people were talking to him and listening to his conversations in jail. Ultimately, defense counsel requested an extension of time to evaluate defendant and produce evidence of his competency to the court. The court granted 30 days to secure a mental health examination at the expense of the Indigent Defender Board; however, the defense counsel failed to produce any evidence from the mental examination that would support his incompetency claim.
 

 Subsequently, at a November 2007 hearing, defense counsel informed the court that they had secured a psychologist, Dr. James B. Pinkston, to examine defendant and that they would be filing a motion for a sanity commission when they received his report. However, defense counsel failed to produce a medical report of Dr. Pinkston’s evaluation of the defendant’s competency. Again, at a hearing on April 8, 2008, defense counsel made clear that experts were still being consulted and reminded the court of a “black spot” on defendant’s brain that a neurologist needed to assess. After the hearing in April, there appears to be no additional discussion of filing a motion for a sanity commission, and Dr. Pinkston’s report was never produced. Defense counsel argues that a formal motion for a sanity commission need not be filed, as long as reasonable grounds exist to doubt his client’s mental capacity Into proceed have been demonstrated.
 

 In reviewing the record, this Court found medical evidence existed in the contemporaneous records
 
 [1]
 
 of defendant’s pretrial incarceration in the Morehouse Parish Prison
 
 [2]
 
 and treatment at Bastrop Mental
 
 *230
 
 Health Center.
 
 [3]
 
 Because no scientific evidence was introduced pretrial to support the defendant’s claim that the trial court erred in failing to find reasonable grounds to order a sanity commission on its own motion, defendant relies on anecdotal evidence from the pre-trial record that might suggest mental illness. However, nothing presented to the court directly called into question defendant’s ability to assist counsel or understand the charges against him. |12Pefense counsel failed to present evidence that proved that the defendant could not: recall facts pertaining to his actions; listen to the witnesses’ testimony and inform his lawyer of any misstatements; or testify in his own defense. Moreover, the glaring omission of Dr. Pinkston’s report serves only to highlight the lack of hard evidence of incompetency. Finally, trial counsel’s failure to file a motion requesting a sanity commission or turn over Dr. Pink-ston’s report to the court or the state, after repeated promises to do so, makes defendant’s current claim that the trial court failed to discharge its due process obligations appear disingenuous. Accordingly, nothing in defense counsel’s argument suggests the trial court abused its discretion by failing to, on its own motion, institute a sanity commission, pre-trial.
 

 Motion For a New Trial
 

 Defendant argues that the trial court erred by failing to inquire into his competency post-trial. Specifically, he claims significant evidence was presented in the motion for a new trial which reasonably raised doubts about defendant’s competency. LSA-C.Cr.P. art. 851 states in pertinent part:
 

 The court, on motion of the defendant, shall grant a new trial whenever:
 

 (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
 

 (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may hot be entitled to a new trial as a matter of strict legal right.
 

 113Moreover, under the Eighth Amendment, -the State may not execute
 
 *231
 
 “one whose mental illness prevents him from comprehending the penalty or its implications.”
 
 Ford v. Wainwright,
 
 477 U.S. 399, 417, 106 S.Ct. 2595, 2606, 91 L.Ed.2d 335 (1986);
 
 see also, State v. Perry,
 
 502 So.2d 543, 563-64 (La.1986) (LSA-Const. art. I, § 20 precludes execution of one “who lacks the capacity to understand the death penalty”).
 

 In the instant case, defendant filed his motion for a new trial in July 2009, claiming the newly acquired medical records from both the Morehouse Parish Detention Center and the Bastrop Mental Health Center and the re-evaluation from Dr. E.H. Baker
 
 [4]
 
 warranted a new trial. Initially, Dr. Baker testified during the penalty phase that defendant was of average intelligence, displayed the attributes of the average prisoner, and demonstrated no significant signs of a mental disorder. Notably, the motion did not allege that the newly available materials indicated that defendant had not been competent to stand trial. The motion did allege that the medical records revealed that defendant in fact suffers from serious mental illnesses and that the State was aware of his mental condition because it had access to the Morehouse Parish Prison records.
 

 In Dr. E.H. Baker’s post-trial psychological evaluation, he indicated after reassessing defendant, in light of the medical records from the Morehouse Parish Prison and the Bastrop Mental Health Center, that defendant was suffering from acute 114mental illness at the time of trial. Specifically, Dr. Baker found that defendant was suffering from symptoms of depression, hallucinations, and delusions. He diagnosed defendant with “Depressive Disorder” and “Brief Reactive Psychosis.” Dr. Baker explained that upon his review of the medical records, defendant exhibited symptoms of mental illness from the date of his arrest when-he was placed on suicide watch and given immediate medical treatment to alleviate those symptoms. Dr. Baker explained that the delusions centered around defendant’s belief that individuals were listening to and recording his thoughts and conversations. He testified that defendant’s symptoms did abate somewhat after he received medication while in jail. Dr. Baker stated that had he been privy to these medical records earlier he would have been able to more accurately diagnose defendant’s mental illness. He found that the records provided him with critical information about how to engage the defendant in the subject matter of the delusions, therefore obtaining more accurate information about his mental health.
 

 After hearing arguments from both sides, the trial court properly denied defendant’s motion for a new trial. After excluding possible ineffective assistance of counsel claims regarding failing to secure the mental health records before trial and claims of prosecutorial misconduct in failing to disclose the records to the defense counsel, the trial court concluded there was overwhelming evidence presented against the defendant in the guilt phase, and the new evidence did not come close to proving that there was anything unjust or unfair about the verdict of the jury in the penalty phase. In the court’s view, Dr. Baker’s opinion, after reviewing defendant’s mental health records, did not give rise to a reasonable likelihood of a different result at a | ^second penalty-phase trial.
 

 Based on Dr. Baker’s report and the medical records review, defendant now
 
 *232
 
 claims that the trial court erred by failing to find he was entitled to a new trial because the medical records, as explicated by Dr. Baker, show clearly that defendant lacked the competency to stand trial as a result of his severe mental illness. This Court notes that as an initial matter, defendant’s complete medical records could have been obtained by defense counsel before trial. This omission creates issues related to meeting the due diligence requirement of LSA-C.Cr.P. art. 851(3), particularly when defense counsel had some suggestion of mental health issues before trial.
 

 We note that defendant’s motion for new trial, although drawing heavily on the mental health records and Dr. Baker’s reformed opinion, inexplicably did not raise the question of his competency to stand trial, or the requirement of competency of one facing execution. In fact, while Dr. Baker changed his opinion entirely on the basis of the records, and even ventured an opinion that defendant was suffering from the effects of mental illness at the time of the offense, the psychologist did not offer an opinion with regard to whether defendant’s mental disorder may have rendered him incompetent to stand trial.
 
 [5]
 
 Thus, the trial court was never formally called upon to |,(¡consider defendant’s competency even in this post-verdict context.
 

 Defense counsel argues that the mental health information allegedly uncovered after trial places the defendant’s competency at issue, retrospectively. It is well settled that this Court disfavors retrospective determinations of competency when competency has been affirmatively placed at issue.
 
 State v. Nomey,
 
 613 So.2d 157 (La.1993). However, under certain limited circumstances, a retroactive determination of sanity may be permissible if it is proven that the trial court ignored reasonable grounds for doubting a defendant’s competency.
 
 No-mey,
 
 613 So.2d at 161 n. 8;
 
 State v. Snyder,
 
 98-1078, p. 29-32 (La.4/14/99), 750 So.2d 832, 854-55. This exception to the general rule is not applicable to the instant case.
 

 In the present case, although defense counsel repeatedly indicated to the court before trial that the defense counsel would move for a sanity hearing to determine the defendant’s competency to proceed, he never did so, even after securing a mental health evaluation at the expense of the indigent defender board. Notably, the report from that examination was never produced or presented to the trial court, nor has it been discussed by appellate counsel, in brief. Furthermore, defense counsel, evidently having enough confidence in the defendant’s capabilities to do so, placed the defendant on the stand to testify in the guilt phase. A review of defendant’s testimony demonstrated that he was able to pinpoint with particularity his whereabouts prior to, during, and after the murder. He was able to delineate each event leading up to and after the incident in question. We find that the defendant’s testimony pre
 
 *233
 
 sented no particularized basis to reasonably question the defendant’s competency to stand trial, or to assist his attorney in the preparation and advocation of his defense. Indeed, it established quite the opposite. This Court finds that nothing in the record suggests that the trial court was on notice, or should have been on notice, that the defendant’s | |7competency to stand trial was affirmatively at issue.
 

 We also note that the defendant’s own testimony at trial belies any suggestion he was unable to assist in his defense, or that he did not understand the charges against him. Despite Dr. Baker’s modification of his earlier assessment of the defendant and of his testimony at the guilt phase, based upon the additional mental health records, he did not specifically make a determination or give an opinion that the defendant was incompetent prior to or during trial. He indicated he would have been able to diagnose more accurately the defendant’s mental illness had he had the benefit of the records prior to the guilt phase. Notwithstanding that modification and his belief the defendant was mentally ill at the time of trial and also at the time of the offense, Dr. Baker did not conclude the defendant had not been competent to stand trial. Indeed, he had noted that the defendant’s mental status had improved with the administration of anti-psychotic drugs. Moreover, the defendant’s competency either prior to trial or at the time of trial was not a basis for the defendant’s new trial motion.
 

 Viewing all of the evidence in this record, we conclude that there was no reasonable basis for questioning the defendant’s competency to stand trial, or to assist in his defense. Accordingly, we find no error in the trial court’s failure to appoint a sanity commission or to grant defendant’s motion for new trial.
 

 VOIR DIRE
 

 11«BATSON CHALLENGE
 

 Defense counsel contends that the trial court erred in finding that defendant failed to establish a prima facie case of discriminatory use of peremptory challenges by the State against three qualified African-American prospective jurors in violation of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
 

 Discriminatory use of peremptory challenges by a prosecutor to exclude potential jurors based solely on race has been long considered a constitutional violation.
 
 Id,.; Swain v. Alabama,
 
 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). This Court has further explained in
 
 State v. Anderson,
 
 06-2987 (La.9/9/08), 996 So.2d 973, 1004:
 

 In
 
 Batson,
 
 the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person’s race. The Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection clause of the 14th Amendment in
 
 Miller-El v. Dretke,
 
 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the
 
 Batson
 
 ruling in LSA-C.Cr.P. art. 795.
 
 [6]
 

 See also, State v.
 
 
 *234
 

 Snyder,
 
 1998-1078 (La.9/6/06), 942 So.2d 484,
 
 rev’d on other grounds, Snyder v. Louisiana,
 
 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).
 

 | l9If the defendant makes a prima fa-cie showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the
 
 Batson
 
 analysis, whether the defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible.
 
 Rice v. Collins,
 
 546 U.S. 333, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006), quoting
 
 Burkett v. Elem,
 
 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge.
 
 State v. Tyler,
 
 97-0338, at 3 (La.9/9/98), 723 So.2d 939, 942,
 
 cert. denied,
 
 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999).
 

 The trial court’s findings with regard to a
 
 Batson
 
 challenge are entitled to great deference on appeal.
 
 Id.
 
 at 4, 723 So.2d at 943;
 
 see also, State v. Juniors,
 
 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a
 
 Batson
 
 objection to the State’s exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor’s race-neutral explanations to be credible. “Credibility can be measured by, among other factors, the prosecutor’s demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.”
 
 Miller-El,
 
 537 U.S. at 339, 123 S.Ct. at 1040.
 

 The three-step
 
 Batson
 
 process which guides the courts’ examination of peremptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:
 

 A defendant’s
 
 Batson
 
 challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the 1 gnprosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
 

 Collins,
 
 546 U.S. at 338, 126 S.Ct. at 973-74.
 

 Our review of this record indicates that after all cause challenges were exercised, there were 32 remaining potential jurors, eight of whom were African-American.
 
 *235
 
 The court then asked the State and defense counsel to submit their peremptory-challenges. Defense counsel submitted nine challenges while the State submitted three. Of the first three peremptory challenges used by the State, two were used to remove African American jurors, Stephanie Bias and Charity Phenix. Defense counsel used four of his nine challenges to remove African-American jurors. In the second round of peremptory challenges, defense counsel used his remaining three challenges to remove three white jurors, Roxie Gates, Candace Hale, and Catherine Spillers, while the State used one challenge to remove a white juror, Theresa Filhiol. The State was then given another opportunity to exercise its remaining peremptory challenges. This time, the State used three more challenges to strike two white jurors, Melanie Matthews and Mindy Burton, and one African-American juror, LaToya Pruitt. After those peremptory challenges were made, only one African-American juror remained in the pool. It was at this point that defense counsel raised its
 
 Batson
 
 challenge. After the challenge was made, there was considerable discussion as to how many strikes each side used against African-American jurors. Ultimately, the State clarified:
 

 [Counsel]: Well, first of all, we exercised seven perempts, not six like he said. And there were four against whites, three against African-Americans ,21 Court: Okay
 

 [Counsel]: He indicated the defense had used two perempts against African Americans. That’s incorrect. They perempted Ms. Dorsey, who is an African-American, Ms. Johnson, who is an African-American, Ms. Sampson, who is an African-American, Ms. Clay, who is an African-American. So there are four that we did not use them on. So he’s saying because the state used their last perempts, we only had one African-American. We didn’t use any perempts on four that they used perempts on. I’ve got five left. If I wanted to cleanse this jury, I could still do that.
 

 After sorting out the number of challenges each side used against African American jurors, the trial court denied defense counsel’s challenge, stating:
 

 ... What I have in this case is that numerically, although not percentage-wise, [defendant] excluded more jurors of African-American extraction than the state has. Percentage-wise they’ve used a higher percentage of their exercise [sic] perempts against African-American jurors, but that’s because they’ve exercised less, almost less than well, almost just half. The case fails. So lets go ahead and pick the jury. The prima facie part of the case fails. It was a good try, though.
 

 Defendant now claims the court erred by finding that he failed to establish a prima facie case of discrimination, thus ending the
 
 Batson
 
 inquiry at the first step. He first argues the court applied the wrong legal standard and took into account irrelevant factual considerations when finding defendant had not made a prima facie case of racial discrimination. Specifically, he claims the court required defendant to show systematic exclusion of African-Americans in order to make a prima facie case of discrimination. Moreover, defense counsel argues the court erred by considering defendant’s challenges of African-American jurors.
 

 It is clear that the trial court did take defendant’s own challenges into account |22when denying his
 
 Batson
 
 claim; however, this consideration is arguably relevant given that of the eight potential African-American jurors in the pool, defendant removed four, and the State only
 
 *236
 
 struck three. Defendant relied on little evidence other than the number of strikes against African-Americans by the State, and the fact that only one remained at the end of jury selection, to build his prima facie case. Although defense counsel failed to argue his
 
 Batson
 
 claim at trial, he now points to the State’s comment that “If I wanted to cleanse this jury, I could still do that,” as further evidence of the State’s desire to have an all white jury. However, despite defense counsel’s attempt to find the State’s comment as “ethnic cleansing,” this Court finds that the State’s remark hardly shows a discriminatory intent. Similarly, we find that defense counsel’s claim that the number of peremptory challenges against African-American jurors somehow proves the State’s desire to remove all African-American jurors is baseless.
 

 Ultimately, when considering the evidence presented to support the challenge for cause in the trial court, which amounted to nothing more than the State using three of its seven challenges to remove African-Americans, we find that it does not appear to be an abuse of discretion by the court to deny the claim. This conclusion is further supported by the fact that in the final round of peremptory strikes, the State only used three of its remaining eight challenges. It could have easily used one of its unused five challenges to remove the final African-American juror, if that was its intent. While at first glance, seven of eight African-Americans being removed from the jury pool might raise suspicions of discrimination, when looking at the facts in totality, it was reasonable for the trial court to find defendant had failed to establish a prima | ^facie case, even in light of the low bar set in
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).
 
 [7]
 

 Challenge for Cause
 

 Defense counsel contends that the trial court erred in denying eight cause challenges against perspective jurors (Jeffery Bryan, Lameika Johnson, Anita Dorsey, Kimberly Williams, Roxie Gates, LeChina Clay, Candace Hale, Susan Lomax), who he claims clearly demonstrated their inability to consider a life sentence and/or consider the mitigating circumstance of intoxication.
 

 The United States Constitution’s Sixth Amendment guarantees the accused the right to a trial by an impartial jury. The Louisiana Constitution Article I, Section 17(A) provides that a defendant has a right to challenge jurors peremptorily, with the number being fixed by law at twelve. LSA-C.Cr.P. art. 799. When a defendant uses all of his peremptory challenges, a trial judge’s erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence.
 
 State v. Jacobs,
 
 99-1659, p. 5 (La.6/29/01), 789 So.2d 1280, 1284;
 
 State v.
 
 
 *237
 

 Cross,
 
 93-1189 (La.6/30/95), 658 So.2d 683, 686;
 
 State v. Maxie,
 
 93-2158 (La.4/10/95), 653 So.2d 526, 534;
 
 State v. Robertson,
 
 92-2660 (La.1/14/94), 630 So.2d 1278, 1280. A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the entire voir dire reveals the trial judge abused its discretion.
 
 Robertson,
 
 92-2660, 630 So.2d at p. 1281. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges.
 
 Cross,
 
 93-1189 at 1192, 658 So.2d at 686;
 
 State v. Robertson,
 
 92-2660 at 3-4, 630 So.2d at 1280;
 
 State v. Ross,
 
 623 So.2d 643, 644 (La.1993). An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation of his constitutional and statutory rights and constitutes reversible error.
 
 Cross,
 
 93-1189 at p. 6, 658 So.2d at 686;
 
 State v. Bourque,
 
 622 So.2d 198, 225 (La.1993).
 

 “A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied.”
 
 State v. Jones,
 
 474 So.2d 919, 926 (La.1985). However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence.
 
 Robertson,
 
 92-2660 at p. 4, 630 So.2d at 1281. Thus, to establish reversible error warranting reversal of a conviction and sentence, defendant must demonstrate “(1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges.”
 
 Id.
 
 at 1281. In the instant case, it is [^undisputed that defense counsel exhausted his peremptory challenges, and, therefore, need only show that the trial court abused its discretion by denying a challenge for cause.
 

 A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. LSA-C.Cr.P. art. 800. According to LSA-C.Cr.P. art. 797(2) and (4), the State or the defendant may challenge a juror for cause on the ground that:
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 [[Image here]]
 

 (4) The juror will not accept the law as given to him by the court;
 

 The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror .in accordance with his instructions and his oath.”
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded);
 
 see also, Wainwright v. Witt,
 
 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Jurors who cannot consider both a life sentence and a death sentence are “not impartial,” and cannot “accept the law as given ... by the court.” LSA-C.Cr.P. art. 797(2),(4);
 
 State v. Maxie,
 
 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35. In other words, if a | gfiProspective juror’s views on the death penalty are such that they would “prevent
 
 *238
 
 or substantially impair the performance of their duties in accordance with their instructions or their oaths,” whether those views are for or against the death penalty, he or she should be excused for cause.
 
 State v. Taylor,
 
 99-1311, p. 8 (La.1/17/01), 781 So.2d 1205, 1214. The failure to disqualify a prospective juror unable to consider both life and death as penalties constitutes reversible error.
 
 Divers,
 
 94-0756 at 8-13, 681 So.2d at 324-327 (challenges to two jurors who felt that any “deliberate” or “intentional” killing merited the death penalty should have been granted);
 
 Maxie,
 
 93-2158 at 23, 653 So.2d at 537-538 (it is an error not to disqualify a juror who could listen to mitigating evidence but viewed death as the only appropriate penalty, “[o]nce the crime guilt is established.”);
 
 State v. Robertson,
 
 92-2660, 630 So.2d at 1283-84 (it is an error not to grant challenge for juror who would vote automatically for death if the accused were convicted of the double murders charged);
 
 State v. Ross,
 
 623 So.2d 643, 643 (La.1993) (it is an error to deny challenge for juror who felt that the “only penalty” upon conviction of first degree murder was death).
 

 Additionally, while cognizant of the broad discretion afforded a district court when ruling on cause challenges, this Court has cautioned that a prospective juror’s responses cannot be considered in isolation and that a challenge should be granted, “even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred].”
 
 State v. Jones,
 
 474 So.2d 919, 929 (La.1985);
 
 See State v. Frost,
 
 97-1771, p. 4 (La.12/1/98), 727 So.2d 417, 423;
 
 Maxie,
 
 93-2158 at 16-17, 653 So.2d at 535;
 
 State v. Hallal,
 
 557 So.2d 1388, 1389-1390 (La.1990) (per curiam);
 
 State v. Brown,
 
 496 So.2d 261, 264-65 (La.1986);
 
 State v. Smith,
 
 430 So.2d 31, 38 (La.1983). Yet a refusal to disqualify a prospective juror on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence.
 
 State v. Howard,
 
 98-0064, pp. 7-10 (La.4/23/99), 751 So.2d 783, 795-797;
 
 Robertson,
 
 630 So.2d at 1281. Thus, a prospective juror who simply indicates his or her personal preference for the death penalty need not be stricken for cause.
 
 State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921, 936;
 
 State v. Lucky,
 
 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850. Not every predisposition or leaning in any direction will rise to the level of substantial impairment.
 
 Tate, supra; State v. Taylor,
 
 99-1311, p. 11 (La.1/17/01), 781 So.2d 1205, 1217.
 

 Juror Jeffery Bryan
 

 Defense counsel argues that the trial court erred in denying his challenge for cause against Jeffery Bryan, who according to the defense, has views about the death penalty that substantially impaired him from performing his duties as a juror. During voir dire, Mr. Bryan, who actually served on the panel as the 12th juror selected after defense counsel had exhausted its peremptory challenges, stated that after determining there were aggravating circumstances in a case, he would be very hesitant to impose a life sentence. In his jury questionnaire, Mr. Bryan stated he would always vote to impose the death penalty when a defendant is found guilty of Igfiinurder and is eligible for the death penalty.
 
 [8]
 
 He also stated that in circum
 
 *239
 
 stances such as those presented in the instant case, where the defendant killed multiple people, he could not imagine anything that would sway him from voting to impose a death sentence. He further stated that he could not consider a life sentence in any case of an intentional murder. Specifically, Bryan told defense counsel, “Well, if you’re going to ask me for an example, I can’t think of any example right off the top of my head. I can’t think of where life would be appropriate when they’ve taken a life. |2;>And I’m trying to be as straight forward as I can.” However, Mr. Bryan also stated that he might consider a life sentence if there was a mitigating circumstance that warranted it. The following exchange took place:
 

 [Counsel]: But what if he [a defendant] was undergoing some extreme mental or emotional disturbance at the time.
 

 Bryant: I could see where I might consider not the death penalty if that’s what your question is. I could see that there would be a possibility of me not choosing death. I just have to look — hear the exact case and I know in my heart what I needed to do as soon as I heard it. I just — you mean in general?
 

 [Counsel]: Uh-huh (yes).
 

 Bryan: That’s about as general as — just about as specific as I can get, you know. I mean, I’d have to hear what it was.
 

 [Counsel]: Okay, but—
 

 Bryan: Because you said I’d have to weigh these things myself and everything else has to be weighted. I have to weigh it as I hear it, I guess. I’m a pro-death penalty person. I mean, I’ll admit that. But I would say that there’s not— I’m not a hundred percent anything. I’d have to hear before I’d say which way I’d go. What did I say in my questionnaire?
 

 The record demonstrates that Mr. Bryan stated that he was a “pro-death penalty person,” but he also stated that he was “not a hundred percent anything.” He stated in his questionnaire that if a defendant is found guilty, he would always vote to impose the death penalty. Mr. Bryan also admitted that is the way he “felt at the time.” He further stated:
 

 Bryan: ... But when I think about it, I guess there could be situations where I’d have to consider that the death penalty might not be appropriate all the way....
 

 [[Image here]]
 

 |sn[Counsel]: Then you’ve got [as a written response] penalty of death is justified in all cases where more than one person has been killed by a criminal act. And you have yes.
 

 
 *240
 
 Bryan: What?
 

 [Counsel]: The penalty of death is justified in all cases where more than one person has been killed in a criminal act? Bryan: Yeah. Like somebody from a tower or something picking people off. That kind of thing.
 

 [Counsel]: So do you still feel that way that a penalty of death is justified— Bryan: In that particular situation, if they’ve killed several people. I can’t think of anything that would change that, any mitigating, aggravating or whatever legal term it is for it that would change my mind about that.
 

 [Counsel]: About somebody killing more than one person?
 

 Bryan: Yeah, more than one person.
 
 [9]
 
 Voir dire examination of Mr. Bryan closed in the following exchange with defense counsel:
 

 [Counsel]: [I]f a person intentionally takes somebody else’s life, do you feel under that circumstance that they forfeit their right to their own life?
 

 Bryan: Yes. I would have to say yes. [Counsel]: Considering the fact that that is what you believe, how ... could a life sentence ever be justified when somebody intentionally murders somebody?
 

 Bryan: Well, if you’re going to ask me for an example, I can’t think of any example right off the top of my head. I can’t think of where life would be appropriate when they’ve taken a life. And I’m trying to be as straightforward as I can.”
 

 IS1 At first glance, Mr. Bryan’s responses appear almost identical to those of juror Robert Payne in
 
 State v. Robertson,
 
 a case in which this Court reversed the trial court’s denial of the defendant’s cause challenge of Payne. 92-2660 (La.1/14/94), 630 So.2d 1278. When counsel asked Payne if he would automatically vote for the death penalty if the defendant was convicted of both counts of first degree murder without regard to any mitigating evidence, Payne answered in the affirmative.
 
 Id.,
 
 92-2660 at 6, 630 So.2d at 1282. Although Payne also said he would be able to apply the law as given to him by the court, this Court held:
 

 [I]t was clear that Mr. Payne would automatically vote for the death penalty in the case of a double murder. That a prospective juror can conceive of certain situations where he might vote for life imprisonment rather that [sic] for death is inconsequential where that same juror has clearly stated he could only vote for the death penalty in the case before him.
 

 Id.,
 
 92-2660 at 7, 630 So.2d at 1283. The facts in
 
 Robertson
 
 are distinguishable from the instant case because Mr. Bryan never stated he would automatically impose the death penalty. More importantly, Mr. Bryan specifically said on at least two occasions he would consider mitigating evidence before deciding on the appropriate penalty. Mr. Bryan’s statements during voir dire bear a closer resemblance to those of a juror in
 
 State v. Carmouche,
 
 01-0405 (La.5/14/02); 872 So.2d 1020. In
 
 Car-mouche,
 
 the defendant argued the trial court erred in refusing to grant his challenge for cause regarding prospective juror Larry Guidry. During voir dire, Gui-dry stated he believed no one has the right to do what defendant did and death is the only appropriate penalty for killing three people, two of whom are children. Car
 
 *241
 

 mouche,
 
 01-0405 at 14, 872 So.2d at 1031-32. This Court held:
 

 |a2We recognize that Mr. Guidry’s indication that death is the only appropriate penalty where the defendant kills three people, two of whom are children, is similar to that in Robertson, where the juror indicated that death is the only appropriate penalty for double murder. In Robertson, however, the juror repeatedly made it clear that he would automatically vote to impose the death penalty in a case of a double murder regardless of any mitigating evidence, and the juror was never sufficiently rehabilitated. In this case, the court’s questioning of Mr. Guidry reveals Mr. Guidry’s impartial position that, even if the defendant were found guilty, he would not vote for the death penalty if he did not believe it was merited.
 

 Id.,
 
 01-0405 at 16, 872 So.2d at 1033 (internal citation omitted).
 

 Similar to the juror in
 
 Carmouche,
 
 Mr. Bryan did not state he would automatically impose the death penalty if the defendant was found guilty of both charges of first degree murder in this case. Instead, Bryan repeatedly stated he thought the death penalty is “justified” when more than one person has been killed. This is an important distinction because Mr. Bryan did not state the death penalty was the only appropriate penalty when more than one person is killed or that he would not consider a life sentence if the defendant were found guilty of both charges. Mr. Bryan merely indicated he could impose the death penalty under the facts of this case, not that he necessarily would impose it. Although Mr. Bryan could not provide an example of when a life sentence would be appropriate when someone has intentionally killed another person, this statement alone does not show Mr. Bryan was unwilling to consider mitigating evidence or impose a life sentence under the facts of this case.
 

 After listening to the entire exchange, the trial court ultimately denied defendant’s cause challenge of Mr. Bryan, finding that Mr. Bryan demonstrated a | ^willingness to refine his views after being examined and after being advised of certain rules of law. The court observed Mr. Bryan as being “no different ... from any other who walk in here with particular attitudes that they had ... at home.” The court noted that he realized that “this is serious business” and he will consider to the mandates of the law. The court also noted that during voir dire, Mr. Bryan seemed to “wake him up, and he said to himself, hey, wait a minute. Let me think about that.” The court denied defense counsel’s cause challenge based on the evidence presented.
 

 After reviewing the entire voir dire, we submit that Mr. Bryan’s answers indicate that he would abide by the law. He stated more than once that he would consider the mitigating circumstances pri- or to determining whether to impose a sentence of death. While Mr. Bryan appears predisposed to the death penalty, he did state he would consider mitigating circumstances. This Court has upheld denials of challenges for cause in such situations.
 
 See State v. Broaden,
 
 99-2124, pp. 11-12 (La.2/21/01), 780 So.2d 349, 358,
 
 cert. denied,
 
 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (cause challenge properly denied for juror who was not unwilling to consider a life sentence and would not automatically vote for the death penalty);
 
 State v. Miller,
 
 99-0192, pp. 18-19 (La.9/6/00), 776 So.2d 396, 408,
 
 cert. denied,
 
 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001) (prospective jurors who expressly agree to consider both life and death sentences and to consider any mitigating evidence are not properly excused
 
 *242
 
 for cause);
 
 State v. Lucky,
 
 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850,
 
 cert. denied,
 
 529 U.S. 1028, 120 S.Ct. 1429, 146 L.Ed.2d 819 (2000) (denial of cause challenge upheld for juror who stated that he was predisposed to the death penalty and that the mitigating evidence would have to be Insubstantial for juror to recommend life sentence);
 
 State v. Chester,
 
 97-2790, p. 14 (La.12/1/98), 724 So.2d 1276, 1285,
 
 cert. denied,
 
 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999) (no abuse of discretion for denying cause challenge for juror who stated that “in an appropriate case” she could return a life sentence);
 
 State v. Hart,
 
 96-0697, pp. 7-10 (La.3/7/97), 691 So.2d 651, 656-58 (approving denial of cause challenge against juror who believed that the death penalty for an intentional killing “ought to be the law,” but agreed to abide by the judge’s instructions and to consider both life and death sentences). We find that having a personal preference for the death penalty does not render a juror unfit for service on a capital jury if he indicates he would not automatically vote for the death penalty and could consider both aggravating and mitigating circumstances in reaching a sentencing verdict on the basis of the evidence presented at trial.
 
 State v. Higgins,
 
 03-1980, pp. 30-31 (La.4/1/05), 898 So.2d 1219, 1238-39;
 
 State v. Lucky,
 
 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850.
 

 This Court has stated that
 

 [a] trial court’s refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has voiced an opinion seemingly prejudicial to the defense, if the juror, on further inquiry or instruction, demonstrates a willingness and ability to decide the case impartially according to the law and evidence.
 

 Lucky,
 
 96-1687 at p. 6, 755 So.2d at 850.
 

 In the instant case, Mr. Bryan did not demonstrate “an unconditional willingness to impose a death penalty under any and all circumstances.”
 
 See State v. Dunn,
 
 01-1635, p. 17 (La.11/1/02), 831 So.2d 862, 876
 
 (quoting State v. Chester,
 
 97-2790, p. 15 (La.12/1/98), 724 So.2d 1276, 1285-86). Here, the trial court determined that Mr. Bryan could be fair and consider mitigating circumstances. On this record, we cannot say the trial court abused its discretion in denying the challenge for cause as to Mr. Bryan. This argument lacks merit.
 

 Juror Lameika Johnson
 

 Defense counsel points to Ms. Johnson’s voir dire testimony in which she stated that if you take someone’s life you are “forfeiting yours to be taken too.” She went on to state that position would not change even if it was shown that the defendant was under considerable stress at the time, was under 18 years old, intoxicated, under the influence of another person, or had no prior criminal history. Finally, when asked how strongly she held these beliefs she stated, “about ninety percent.” Defendant argues that these statements show a clear inability to consider mitigating circumstances or choose a life sentence over the death penalty.
 

 However, the record demonstrates that when questioned by the State, Ms. Johnson stated that after hearing all the evidence in the penalty phase she could render a life sentence verdict if appropriate. Moreover, when questioned by the court later in the proceedings, Ms. Johnson reaffirmed that while she believed in the death penalty “about ninety percent,” she could follow the instructions of the court and the law with regard to considering a life sentence. Finally, when asked, “You’re not unalterably opposed to considering [a life sentence]. Is that correct?” Ms. Johnson responded, “That’s correct.”
 

 
 *243
 
 Based on her testimony, it is undeniable that Johnson is pro-death penalty. |afiHowever, the record shows that Ms. Johnson made it clear that she would be able to listen to the mitigating evidence and weigh all factors before choosing between a life sentence and the death penalty. Accordingly, given the rehabilitation by the trial court which revealed Ms. Johnson’s willingness to decide the case fairly according to the law and evidence, we find the trial court did not abuse its discretion.
 
 See Howard,
 
 98-0064, pp. 7-10, 751 So.2d at 795-97;
 
 Robertson,
 
 630 So.2d at 1281.
 

 Juror Anita Dorsey
 

 Defense counsel noted that Ms. Dorsey testified that she believes in the concept of a “life for a life.” She also states that after someone was found guilty of first degree murder she would vote for the death penalty and would only 'change her mind if he acted out of self defense. However, like Ms. Johnson, Ms. Dorsey also stated that she could listen to the evidence presented during the penalty phase, and if appropriate she could vote to impose a life sentence.
 

 The trial court ultimately denied defendant’s cause challenge finding that there was not enough evidence of a deep rooted conviction about the death penalty and her comments reflected a lack of knowledge about the law. This Court noted in
 
 State v. Lee,
 
 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108, that a trial judge is accorded broad discretion in ruling on cause challenges because he or she “has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties’ attorneys.”
 
 See also State v. Cross,
 
 93-1189, pp. 6-7 (La.6/30/95), 658 So.2d 683, 686-87;
 
 Robertson,
 
 92-2660, p. 3, 630 So.2d at 1281. In this case, we find that Ms. Dorsey’s statements, when | a7taken together, do not clearly indicate an unwavering support for the death penalty. Thus, given that a trial court has broad discretion in ruling on challenges for cause, and it was in the unique position to observe Ms. Dorsey during voir dire before making its decision, we find that defense counsel failed to prove the court abused its discretion in this case.
 

 Juror Kimberly Williams
 

 Defense counsel cited the following portion of Ms. Williams’ testimony:
 

 [Counsel]: Ms. Williams, what do you think about this mitigating factor stuff we talked about?
 

 Williams: I feel like it really doesn’t make a difference if there was a reason to believe he was guilty.
 

 [Counsel]: ... We’re talking about in the penalty phase would you consider any mitigating factors that were presented to you?
 

 Williams: I would by law. I don’t think it would make a difference.
 

 [Counsel]: Do you think you would automatically vote for a death verdict if you got to the penalty phase?
 

 Williams: Probably, yeah.
 

 [Counsel]: Just a word of advice for everybody. When you use the word probable, you can be rest assured that there are going to be many questions that follow it.
 

 Williams: I should have said yes.
 

 [Counsel]: ... So the law says that if you’re selected as a juror, the judge will tell you the law says you shall consider any mitigating factors that’s presented to you in determining what is the appropriate sentence. Would you be able to do that or would you automatically vote death?
 

 lasWilliams: Yes, I could do that.
 

 
 *244
 
 The record shows that later, Ms. Williams also stated that she does not believe the death penalty is appropriate in all cases in which one person intentionally kills another, and believes it is of some benefit to consider aggravating and mitigating circumstances even after the person has been found guilty. Finally, during examination by the court, Williams stated that she would seriously consider imposing a life sentence if the circumstances and law warranted it. Accordingly, we note that in this case, it appears the defendant has based his argument on only a small portion of testimony given by Ms. Williams during voir dire. While at first it appeared she had strong convictions concerning the death penalty, it became clear during further questioning by the State, defense counsel, and the court, that Ms. Williams was willing and able to consider all relevant information before deciding to vote for a death or life sentence. Thus, we find that the record as a whole shows that the trial court did not abuse its discretion when denying defendant’s cause challenge.
 

 Juror Roxie Gates
 

 According to defense counsel, during voir dire, Ms. Gates first stated that her decision of whether to impose a life or death sentence “would depend on lots of things that would come out in court.” She also stated that she was strongly in favor of the death penalty and would have a difficult time voting against it after the defendant had been found guilty. However, she reiterated that her decision would depend on the circumstances of the crime and what was presented at trial. Later Ms. Gates stated that the death penalty is justified in all cases where more than one person Lghave been killed by a criminal act. However, Ms. Gates tempered that assertion by stating her vote for a death or life sentence in that situation would depend on what is presented at trial.
 

 When asked about specific factors that might have an impact on her decision, Ms. Gates stated that age of the defendant, whether or not he was intoxicated at the time, and whether or not he was under the influence of another person, would not cause her to vote for life rather than the death penalty. At the same time, however, she stated that other, unspecified, circumstances might cause her to vote for life imprisonment. Moreover, Ms. Gates contradicted herself when asked again about intoxication. This time, Ms. Gates stated that if a person was intoxicated to the point where they would not have committed the crime otherwise, she would “have to hear his story” before deciding the sentence. Later, when brought back for further questioning, Ms. Gates again stated that she has a difficult time believing intoxication could relieve someone of some responsibility, but she would have to hear all the circumstances before making a decision.
 

 The record reveals that the trial court denied defendant’s cause challenge stating in part:
 

 My impression of the lady was she’s favorably inclined towards the death penalty, but she did seem to be sophisticated and intelligent and also — when I say intelligent, what I mean is that she was able to articulate pretty well — her need to hear the facts at trial before she made any of these ultimate decisions.
 

 This case presents a similar circumstance to Anita Dorsey, in that both made Lnstatements during voir dire that would support a conclusion that they are strongly pro-death penalty as well as against intoxication as a mitigating circumstance, but when taken as a whole it is difficult to say whether they lacked the ability to be impartial, particularly given the fact that Ms. Gates repeatedly stated she would need to hear the circumstances of the case before
 
 *245
 
 deciding on a penalty. Moreover, the reasons for the trial court’s denial suggests her demeanor during questioning was a decisive factor in its decision.
 
 See, State v. Lee, supra.
 
 Accordingly, we find that given the lack of clearly partial language from Ms. Gates on either her death penalty or intoxication positions, defense counsel failed to show that the district court abused its discretion by denying the challenge.
 

 Juror LeChina Clay
 

 Defense counsel noted that Ms. Clay believes “[m]ore along the lines of an eye for an eye,” and that “if you take a life ... I think you should give your life for that.” During voir dire, Ms. Clay stated that, while she is “for the death penalty,” she would be able to consider both a death and a life sentence. She reaffirmed that belief by later stating that in situations where manslaughter or self-defense had been ruled out and the defendant had been found guilty of first degree murder, she could still consider a life sentence. She also stated that she would have to consider the mitigating circumstances before making a decision on a penalty.
 

 In this case, defense counsel apparently chose to include only the small portion of Clay’s testimony that would suggest she was unable to consider a life sentence. However, as the record reveals, she repeatedly stated that she was willing to impose |41a life or death sentence, depending on the circumstances presented. When considering the entire record, we find it is clear that defendant’s claim has no merit.
 

 Juror Candace Hale
 

 Defense counsel noted that Ms. Hale’s comments suggested that it would be difficult to find intoxication vitiated specific intent. During voir dire, Ms. Hale stated that she would consider all mitigating and aggravating circumstances before rendering a verdict in the penalty phase. She also stated that after considering the evidence she could vote for the death penalty or a life sentence, depending on what she felt was appropriate. Later, when questioned by the defense, Ms. Hale again stated she would have to hear all the circumstances, and consider her decision very carefully before deciding to impose a life or death sentence. We find that defense counsel presented virtually nothing to support the proposition that Ms. Hale was unable to consider a life sentence. Accordingly, we find that defense counsel failed to show that the trial court abused its discretion when denying his challenge.
 

 Jurors Susan Lomax, Jerral Jacobs, and Ronald Thompson.
 

 As an initial matter, defendant did not raise a cause challenge against either Jacobs or Thompson. This Court has traditionally applied LSA-C.Cr.P. art. 841 to errors occurring during voir dire. It has consistently held that a defendant waives review of irregularities in the selection of the jury when an objection is not timely raised.
 
 See State v. Potter,
 
 591 So.2d 1166, 1168-1169 (La.1991) (failure to make
 
 Batson
 
 objection waived issue on appeal);
 
 State v. Spencer,
 
 446 So.2d 1197, 1200 (La.1984) (review of improper exclusion of blacks from jury not preserved for appeal);
 
 State v. Whitt,
 
 404 So.2d 254, 260 (La.1981) (objection to failure to sequester jury at an earlier time waived);
 
 State v. Bazile,
 
 386 So.2d 349, 351 (La.1980) (improper procedure for selecting venire not reviewable when objection was made after jury was sworn). Given that no challenge was raised concerning the jurors’ inability to consider intoxication as a mitigating circumstance, these claims are waived.
 

 This Court held that a defendant must use one of his remaining peremptory challenges curatively to remove the juror
 
 *246
 
 or waive the complaint on appeal even in a case in which he ultimately exhausts his peremptory challenges.
 
 See, State v. Blank,
 
 04-0204, p. 25 (La.4/11/07), 955 So.2d 90, 113 (“In Louisiana, a defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal.”)(citing
 
 State v. Connolly,
 
 96-1680, p. 8 (La.7/1/97), 700 So.2d 810, 818;
 
 State v. Bourque,
 
 622 So.2d 198, 229-80 (La.1993);
 
 State v. Fallon,
 
 290 So.2d 273, 282 (La.1974)). This aspect of the Court’s jurisprudence bears directly on defendant’s complaints with regard to rulings by the trial court denying his cause challenge of Lomax, and, if they had been raised Jacobs, and Thompson.
 

 In the instant case, after all cause challenges had been heard, the court compiled a list of all remaining jurors, 32 names in all. The court then stated that the first 12 jurors on the list would be the jury unless either side wished to use peremptory challenges. The defense counsel then used nine challenges while the |4SState used three. After the first round of challenges, Lomax, Jacobs, and Thompson were all in the top 12 people remaining on the list. There was then a second round of peremptory challenges in which the defense counsel used their remaining three challenges; however, again, they chose not to remove Lomax, Jacobs and Thompson. Accordingly, because defendant chose not to remove them from the jury while he still had available peremptory challenges, we find that his claims concerning the cause challenges are barred.
 
 See, Blank,
 
 04-0204, p. 25, 955 So.2d at 113.
 

 Juror Jason Thomas
 

 Defense counsel complains about the trial court’s decision in regard to potential juror, Jason Thomas, who defendant claims was challenged based on his inability to render a death penalty verdict.
 

 LSA-C.Cr.P. art. 787 states that “[t]he court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.”
 

 Defense counsel argues that the State challenged Mr. Thomas based on his inability to render a death penalty verdict, despite ample evidence in the record that Mr. Thomas was pro-death penalty. However, a review of the record reveals that Mr. Thomas was challenged by the State based on his relationship with a relative of the defendant. During voir dire it was revealed that two potential jurors, Thomas and Iylon Collins, were close friends with defendant’s niece. After this discovery, the following exchange took place:
 

 |44State: Bottom line, based upon that, for both y’all, are you telling us that for this case, not that you couldn’t do it on another case, but because of this case and your knowledge of some relatives of the defendant, are you telling me you would not render a death verdict? Thomas: Yes
 

 State: ... Is that what you’re telling me, Mr. Thomas?
 

 Thomas: Yes, sir.
 

 The trial court ultimately granted the State’s cause challenge of Mr. Thomas based on the above assertion. We find that the State’s challenge appears to fall squarely within the ambit of LSA-C.Cr.P. art. 797. Mr. Thomas unequivocally stated that he could not be impartial in this case based on his relationship with defendant’s niece. While such a relationship does not warrant automatic dismissal, in this case, defendant does little to show the court abused its discretion by granting the challenge. He merely argues that Mr. Thomas should not have been disqualified based on his views on the death penalty. How
 
 *247
 
 ever, given that Mr. Thomas was not excused on those grounds, but rather was excused based on the effect his relationship with the defendant’s niece would have on his ability to render a verdict, we find that defense counsel’s claims appears to be without merit.
 

 Juror Tonya Staten-McFarland
 

 Defense counsel also contends that the trial court erred by granting the State’s challenge of Tonya Staten-McFarland. According to defense counsel, the State did not establish a valid basis under LSA-C.Cr.P. art. 798 to dismiss McFarland. LSA-C.Cr.P. art. 798 states in pertinent part:
 

 | ¿-It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
 

 (2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
 

 (a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him.
 

 Here, early in voir dire, Ms. McFarland made it known that, while she does not find the death penalty morally objectionable, she believes that a life sentence is a more severe punishment. When questioned by the defense counsel, Ms. McFarland stated that she would be more likely to impose a life sentence because it would subject the defendant to more suffering. Later, during further questioning by the defense counsel, the following exchange took place:
 

 [Counsel]: ... If you found somebody guilty of first degree murder, then are you saying that you would pretty much already have your mind made up on what the penalty should be? The penalty phase would be decided at the verdict phase? That is once you found a person guilty of first degree murder, you would have already made up in your mind what the penalty would be?
 

 McFarland: Yes, sir.
 

 [Counsel]: Because it is your belief that anytime somebody is found guilty of first degree murder, then that life would be the appropriate penalty, not because — because you feel that life is a more severe penalty than death?
 

 McFarland: Yes.
 

 [Counsel]: Now, let me ask you this, though. Would it be possible for you to consider both life and death or is life the only penalty that you would consider?
 

 McFarland: Life.
 

 |4fiThe trial court granted the State’s cause challenge of Ms. McFarland finding that she was unable to consider rendering a death verdict. Defendant’s issue with this ruling appears to be that Ms. McFarland did not demonstrate “conscientious scruples” against the death penalty because she has no moral objection to it, therefore, the challenge did not meet the requirements of Article 798. However, given that Ms. McFarland clearly stated that she would automatically vote for a life sentence after the defendant was found guilty of first degree murder, and would not consider the possibility of the death sentence, it appears she was properly excluded.
 
 See, Witherspoon,
 
 391 U.S. 510, 88 S.Ct. 1770 (holding that a prospective juror who would vote automatically for a life sentence is properly excluded).
 

 Trial Court Was Biased Toward the State
 

 Juror Margaret Calhoun
 

 In this assignment of error, defense counsel argues that the trial court was biased against the defense during voir dire, employing one-sided efforts to reha
 
 *248
 
 bilitate pro-death penalty jurors, while seeking to exclude jurors favoring a life sentence. He also claims the court held the defense to a higher standard with regard to cause challenges, while “robotically granting the State’s cause challenges without analysis.”
 

 A trial judge is presumed to be impartial.
 
 State v. Edwards,
 
 420 So.2d 663, 673 (La.1982);
 
 State v. Collins,
 
 288 So.2d 602, 604 (La.1974). Moreover, in
 
 State v. Jacobs,
 
 99-1659 (La.6/29/01), 789 So.2d 1280, this Court emphasized the 147importance of an active role for the trial court in jury selection, in part, so as not to let prospective jurors slip through voir dire unrehabilitated.
 
 Jacobs,
 
 99-1659 at 9-13, 789 So.2d at 1286-88. According to defense counsel, the record is “littered” with examples of the court failing to be impartial during voir dire. Defense counsel claims the trial court went out of its way to “save” potential juror, Margaret Calhoun, after she clearly stated her unwillingness to consider a life sentence. A review of the record reveals that when the court asked, “... are there any among you who would refuse or fail to consider imposing a sentence of life without benefit of parole, probation, or suspension of sentence?” Ms. Calhoun raised her hand. Then, the court asked, “You’re not opposed to the death penalty in proper cases. Right?” When Ms. Calhoun responded affirmatively, the court then explained the process of a capital trial, and Ms. Calhoun stated that she could consider aggravating and mitigating factors and would not prejudge the case. We find that the trial court did not err as the court was only fulfilling its role as outlined in
 
 Jacobs.
 

 Juror Shannon Martin
 

 Defense counsel complains about potential juror, Shannon Martin, who had indicated some hesitation about imposing the death penalty. After the State challenged her for cause, claiming she could not render a death verdict, the court took the issue under advisement. Later, when she was asked by the court and defense counsel if she would be able to impose the death penalty, she stated both times that she could not. According to defendant, the court then pressed Ms. Martin to clarify whether it would be “very difficult” to impose the death penalty or impossible to do 14Sso. She ultimately stated that she could not do it. Defense counsel claimed this sort of overzealous questioning was proof of the court’s bias toward the State and its attempt to remove pro-life sentence jurors. A review of the record reveals that there is nothing about the exchange that falls outside the scope of the court’s duty under
 
 Jacobs.
 
 Both examples (Jurors Calhoun and Martin) presented by defendant illustrate nothing more than the trial court performing its duty to not to let prospective jurors slip through voir dire unrehabilitated.
 
 See, Jacobs,
 
 99-1659 at 9-13, 789 So.2d at 1286-88. Accordingly, we find that defendant has failed to substantiate a bias by the trial court toward the State.
 

 Death Qualified Jury
 

 Defense counsel argues that the Louisiana’s death qualification procedure is facially unconstitutional because it violates his right to an impartial jury, unfairly leads to a death-prone jury, and deprives him of a fair cross-section of the venire available to non-capital defendants. However, there should be no question of the constitutional validity of LSA-C.Cr.P. art. 798 since it was drafted to conform to the constitutional requirements set forth in
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968);
 
 see also, Wainwright v. Witt,
 
 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841
 
 *249
 
 (1985). In
 
 Lockhart v. McCree,
 
 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit excluding potential jurors under
 
 Witherspoon
 
 or that “death qualification” resulted in a more conviction-prone jury. Likewise, this Court has repeatedly rejected the claim that the
 
 Witherspoon
 
 qualification process results in a l43death-prone jury.
 
 State v. Robertson,
 
 97-0177, pp. 19-20 (La.3/4/98), 712 So.2d 8, 25-26;
 
 State v. Sullivan,
 
 596 So.2d 177, 186-87 (La.1992);
 
 State v. Lindsey,
 
 543 So.2d 886, 896 (La.1989);
 
 State v. Brown,
 
 514 So.2d 99, 103-04 (La.1987);
 
 State v. Bates,
 
 495 So.2d 1262, 1272 (La.1986);
 
 State v. Ford,
 
 489 So.2d 1250, 1259 (La.1986);
 
 State v. Ward,
 
 483 So.2d 578, 582-83 (La.1986);
 
 State v. Jones,
 
 474 So.2d 919, 927 (La.1985);
 
 State v. James,
 
 431 So.2d 399, 402 (La.1983). This Court finds no need to revisit this longstanding principle of law.
 

 Mitigating Evidence
 

 Defense counsel contends that during voir dire the State misled the jury concerning their legal duty to consider mitigating circumstances during the penalty phase.
 

 As a general matter, jurors cannot be instructed to forego considering mitigating circumstances.
 
 See Lockett v. Ohio,
 
 438 U.S. 586, 605-06, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding the Eighth and Fourteenth Amendments require a sentencer not be precluded from considering any aspect of a defendant’s character or record, proffered in mitigation, as a basis for determining sentence). However, a juror need not accept the factors after consideration.
 
 See Atkins v. Singletary,
 
 965 F.2d 952, 962 (11th Cir.1992). Similarly, this Court has instructed:
 

 While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant.... There is a significant difference between a prospective juror’s agreeing to consider mitigating evidence and the juror’s | .^determination of the importance of that evidence.
 

 State v. Miller,
 
 99-0192, p. 8 (La.9/6/00), 776 So.2d 396, 402-03 (footnote omitted). In the instant case, defense counsel notes the State’s characterization of the jurors’ duty when it stated:
 

 ... Now understand we can’t tell you how much weight to give to [mitigating factors]. I think Webster’s Dictionary defines “consider” as to think about it. And you have to think about it. But depending on what the facts are in this case, you may consider it but say, I don’t give it any weight. And if you’ve thought about it and you don’t think it’s appropriate, you don’t think it’s mitigation, you shall consider it. But if you don’t give it any weight, you’re still doing your duty.
 

 The State made several other similar comments including, “It may mean something to you, it may not,” and “It may mean a lot to you, it may mean zero.”
 

 We find that given the jurisprudence discussed above, nothing in the instant record supports defendant’s contentions that the State misstated the law during voir dire when they instructed the panels that they must consider mitigation evidence, but afterwards, they were free to accept or reject it accordingly.
 

 Defense counsel also contends that the State improperly used a hypothetical situation, not remotely related to the facts of this case, in which an intoxicated 17 year old, under the influence of two uncles, serves as the driver during an
 
 *250
 
 armed robbery of a convenience store, but then changes his mind and leaves the scene while the two uncles committed the crime inside. According to defense counsel, this hypothetical influenced several jurors, who otherwise would not have considered mitigating circumstances, to reevaluate their positions.
 

 In
 
 State v. Robertson,
 
 92-2660 (La.1/14/94), 630 So.2d 1278, 1284, this Court |siheld:
 

 a potential juror who indicates that he will not consider a life sentence and that he will automatically vote for the death penalty under the factual circumstances of the case before him is subject to a challenge for cause by the defendant. It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear.
 

 In the present case, defense counsel pointed to three jurors, Shipp, Phillips, and Hoggatt, who he claimed were influenced by this hypothetical and could not otherwise consider a life sentence based on the facts of the case. With regard to juror Shipp, defense counsel claimed that after she heard this hypothetical she completely changed her mind about her ability to consider mitigating circumstances. However, the record reveals that prior to the State presenting the hypothetical, Shipp expressed her willingness to consider mitigating circumstances. After a review of the record, we And that nothing about Shipp’s responses regarding mitigating circumstances substantially changed after hearing the State’s hypothetical later during voir dire; defense counsel failed to show that the hypothetical altered Shipp’s understanding in any meaningful way.
 

 As to juror Hoggatt, completely independent of the State’s hypothetical, he told both the State and the defense counsel that he would consider all mitigating circumstances before reaching a decision about sentencing. Specifically, he told defense counsel, “... I would need to hear the full circumstances before a decision [about sentencing] would be reached.” Again, we find that defense counsel failed to show the hypothetical caused any prejudice against him. Finally, with regard to juror | .^Phillips, it appears no questions about mitigating circumstances were asked until after the State employed its hypothetical as an example. However, nothing about Phillips’s responses indicate that she was misled by the hypothetical. In fact, during questioning unrelated to the hypothetical, Phillips was asked, “... are you going to listen to whatever is presented, whatever it may be, consider it and then vote for what you think is the appropriate sentence?” She responded, “I would have to think on it and listen to the evidence.” Again, we find that defense counsel has failed to show that Phillips was only able to consider a life sentence based on irrelevant mitigating factors. She clearly stated she would listen to all evidence and consider all factors before deciding on a sentence.
 

 GUILT PHASE
 

 Other Crimes Evidence
 

 Defense counsel argues that the trial court erroneously admitted other crimes evidence, violating his right to a fair trial.
 

 Generally, evidence of other crimes, wrongs, or acts committed by the defendant is inadmissible due to the “substantial risk of grave prejudice to the defendant.”
 
 State v. Prieur,
 
 277 So.2d 126, 128 (La.1973). Under LSA-C.E. art. 404(B)(1), however, such evidence may be admitted for the purpose of showing “motive, opportunity, intent, preparation, plan,
 
 *251
 
 knowledge....” Evidence of other bad acts is not admissible simply to prove the bad character of the accused. LSA-C.E. art. 404(B)(1). Furthermore, the other crimes evidence must tend to prove a material fact | ^genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect.
 
 State v. Hatcher,
 
 372 So.2d 1024, 1033 (La.1979);
 
 State v. Sutfield,
 
 354 So.2d 1334, 1337 (La.1978);
 
 State v. Jackson,
 
 352 So.2d 195, 196 (La.1977);
 
 State v. Ledet,
 
 345 So.2d 474, 479 (La.1977).
 

 Under Louisiana Code of Evidence Art. 404(B), other crimes evidence is also admissible “when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” For other crimes to be admissible under this exception, they must bear such a close relationship with the charged crime that the indictment or information as to the charged crime can fairly be said to have given notice of the other crime as well.
 
 State v. Schwartz,
 
 354 So.2d 1332, 1334 (La.1978). Thus, evidence of other crimes forms part of the
 
 res gestae
 
 when said crimes are related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. It is evidence which completes the story of the crime by showing the context of the happenings.
 
 State v. Brewington,
 
 601 So.2d 656, 657 (La.1992). Evidence of crimes committed in connection with the crime charged does not affect the accused’s character because the offenses are committed as parts of a whole.
 
 Id.
 
 The inquiry to be made is whether the other crime is “part and parcel” of the crime charged, and is not offered for the purpose of showing that the accused is a person of bad character.
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973).
 

 The
 
 res gestae
 
 doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the | Mcrime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances.
 
 State v. Huizar,
 
 414 So.2d 741, 751 (La.1982);
 
 State v. Kimble,
 
 407 So.2d 693, 698 (La.1981). In addition, as this Court has observed, integral act (res
 
 ges-tae
 
 ) evidence in Louisiana incorporates a rule of narrative completeness without which the state’s case would lose its “narrative momentum and cohesiveness, ‘with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ”
 
 Colomb, supra,
 
 98-2813 at 4, 747 So.2d at 1076 (quoting
 
 Old Chief v. United States,
 
 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997)).
 

 Moreover, erroneous admission of other crimes evidence is subject to a harmless-error analysis.
 
 See, State v. Maise,
 
 00-1158, pp. 8-9 (La.1/15/02), 805 So.2d 1141, 1147-1148;
 
 State v. Tyler,
 
 97-0338, p. 14 (La.9/9/98), 723 So.2d 939, 947;
 
 State v. Johnson,
 
 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101. An error is harmless if the jury’s verdict actually rendered at trial was “surely unattributable to the error.”
 
 Sullivan v. Louisiana,
 
 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993);
 
 cf. Satterwhite v. Texas,
 
 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (O’Connor, J.) (harmless-error analysis begins with the premise that the evidence admitted at trial is sufficient to support the verdict and asks whether the state can prove “ ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict
 
 *252
 
 obtained.’ ”) (quoting
 
 Chapman v. California,
 
 386 U.S. 18, 22-24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).
 

 | wIn the case at hand, defense counsel complains about five specific instances during the guilt phase of the trial. First, he complains that during her testimony the surviving victim, Jessica Cooper, stated that she was pregnant at the time of the shooting. Defense counsel objected, arguing the testimony raised the issue of an uncharged crime, specifically, attempted feticide. The trial court overruled the objection, finding the fact was part of
 
 res gestae
 
 as it was a fact relevant to the extent of the victim’s injuries and “part of her bodily condition at the time.”
 

 Arguably, this fact does constitute
 
 res gestae
 
 in that it would be difficult for the state to present its case, in relation to the shooting Jessica Cooper, without mentioning it. On the other hand, detailing every aspect of her bodily condition, is not necessarily required to prove defendant was guilty of attempted first degree murder. Regardless, even if the court erred by overruling the objection, the error was clearly harmless. Later in the trial, when defendant testified on his own behalf, he stated that he shot Jessica Cooper. Because defendant admitted to the shooting, the extraneous fact that Cooper was pregnant at the time cannot be said to have influenced the jury in when finding he was guilty of attempted murder.
 

 Defense counsel also complains that during cross examination, the State asked if he knew a man named “Paul Chance.” Defense counsel objected on the basis that Chance “has adverse publicity” connected to sex crime convictions. However, nothing about Chance’s criminal background was mentioned by the State, and furthermore, simply mentioning his name does not amount to the erroneous admission of other crimes evidence. We find that this claim is baseless.
 

 Isjn a footnote, defense counsel cites three more instances in which he claims other crimes testimony was erroneously introduced. First, he complains the State introduced video and testimony of the car chase that ensued after the shootings that directly resulted in defendant’s arrest. However, this evidence clear pertains to police officer testimony of what they observed in a continuous chain of events after the commission of the crime. Undoubtably, this testimony was admissible under the
 
 res gestae
 
 exception.
 
 See, Huizar,
 
 414 So.2d at 751;
 
 Kimble,
 
 407 So.2d at 698. With regard to defense counsel’s complaint about testimony describing his gun cabinet, we find that there is nothing about this testimony that suggest another crime. It merely describes the scene in the home after the crime was committed. This claim is without merit. Finally, defense counsel claims testimony concerning the police’s prior familiarity with him was inadmissible other crimes evidence. However, a review of the record reveals the testimony in question actually concerns defendant working with the police as an informant. As defense counsel makes no argument in connection to this claim, it is unclear why he considers this other crimes evidence. This claim is also without merit.
 

 PENALTY PHASE
 

 Other Bad Acts
 

 Defense counsel contends that the trial court erroneously admitted evidence of other bad acts, i.e., two letters written by defendant from jail. The first letter, addressed to defendant’s daughter, Kelli Odenbaugh, suggests hiring a hit man to kill the surviving victim or to aid his escape from jail. It states:
 

 
 *253
 
 157A11 my hopes seem to be going nowhere. I’m constantly losing in court. Even if there is a bond I can’t allow my mother to spend that much money for 3-4 or 5 yrs of freedom. There are only 3 options in my mind, escape, finish the job do two years for escape, or just end it all. The later is my last choice but I can’t do life in prison. So escape it is. I’ll need some help from you and Colby. I need a key. Do you know Big John Pugh. Black guy lives in Bastrop, he is a hit man — But only one person could talk to him and set it up — price and payment location. Can you do that? Would you. I know you can’t do it yourself. And don’t think Colby could. I’m not asking either one of you for that but it was that way about 20 g’s. And I’d be here with an alibi. If not escape and get a mex to do it. Steve Wainwright knows some in Dallas. So what’s your thoughts, honestly which one do you choose. Escape would be from court with a ride waiting outside when I come out with unlocked hand then change and jump in another car 2 or three blocks away. Let them chase Colby one way while I go toward Monroe, then Shreveport, Then Dallas with Steve. He know how to get NEW NAMES and stuff. I’d need 12-15 thousand. I think Mamaw would do that then I could come back with a lawyer when I was guaranteed to win the case if you understand. This about it. I NEED YOUR opinion. I’ve got nothing to lose. Already losing the case, write? Don’t tell Syd. She talks too much.
 

 Love, Daddy
 

 The second letter, sent to Sydnee Oden-baugh, but addressed to Paul Chance, states:
 

 Hey Paul,
 

 How’s it going with you? Things in here are ok. Getting ready for trial. I do have one problem I need you to handle. “Heather Aaron” She’s 17 or 18. Drives Black S-10. Lives on Van Haynes Rd. She’s a thorn in my side I need you to pull. You know what I want! Syndee will help you find her. 557-9185 Sydnee.
 

 Thanks, Roy
 

 Defense counsel argues that both of these letters amount to inadmissible other crimes evidence. LSA-C.Cr.P. art. 905.2 provides that “[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members.” | BSRules governing the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the defendant’s character and propensities have evolved jurisprudentially. This Court has held that evidence of unad-judicated crimes is admissible during the penalty phase after the trial court determines that (1) the evidence of the defendant’s commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the'unrelated conduct has relevance and substantial probative value as to the defendánt’s character and propensities.
 
 See, State v. Brooks,
 
 541 So.2d 801, 814 (La.1989). The State must furnish notice of it intention to use other crimes evidence within a reasonable time before trial.
 
 State v. Prieur,
 
 277 So.2d 126, 130 (La.1973). In the penalty phase of a first degree murder trial, the character of the defendant is automatically at issue.
 
 State v. Bourque,
 
 622 So.2d 198, 245 (La.1993), overruled on other grounds by
 
 State v. Comeaux,
 
 93-2729 (La.7/1/97); 699 So.2d 16.
 
 See also State v. Jackson,
 
 608 So.2d 949, 953 (La.1992); LSA-C.Cr.P.
 
 *254
 
 art. 905.2. Evidence of unadjudicated other crimes is relevant to the defendant’s character and propensities.
 
 Jackson,
 
 608 So.2d at 954-956;
 
 Brooks,
 
 at p. 813. The jury may also consider the evidence from the guilt phase. LSA-C.Cr. P. art. 905.2.
 

 In
 
 State v. Jackson, supra,
 
 the Court granted pre-trial writs to establish limitations on admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings. There, the Court ruled that the evidence of the unadjudicat-ed criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder.
 
 Jackson,
 
 608 So.2d at 955. Applying Issthe limitations of
 
 Jackson,
 
 this Court in
 
 State v. Bourque,
 
 622 So.2d 198 (La.1993) held that evidence of an unrelated and unadjudicated killing, committed one hour before the murder at issue in the capital case being tried, was admissible since it was relevant evidence of Bourque’s character and propensities and fell within
 
 Jackson’s
 
 limitations. However, a majority of the court reversed the death sentence on the basis that the prosecutor “presented a prohibited ‘mini-trial’ on the issue of the defendant’s guilt or innocence of the killing of Jasper Fontenot,” the unrelated and unadjudicated conduct.
 
 Id.
 
 at 248.
 

 Thus, the
 
 Bourque
 
 decision limited the amount of admissible evidence that the prosecutor may introduce in the case-in-chief of the penalty phase, holding that anything beyond “minimal evidence” of the unadjudicated criminal conduct impermis-sibly shifts the focus of the capital sentencing jury from the character and propensities of the defendant to the determination of the guilt or innocence of the defendant with respect to the unadjudicated criminal conduct. However, in
 
 State v. Comeaux,
 
 93-2729 (La.7/1/97), 699 So.2d 16, this Court revisited the issue and held that
 
 Bourque’s
 
 further limitation on the amount of admissible evidence, no matter how highly relevant to the defendant’s character and propensities, was unnecessary to guarantee due process. The Court noted that the thrust of the
 
 Jackson
 
 decision was not to exclude any evidence that was significantly relevant to the defendant’s character and propensities, no matter what the amount of the evidence was, but rather to maintain the jury’s focus on their function of deciding the appropriate penalty by eliminating marginally relevant evidence that does not aid the jury in performing this function.
 

 | fipAs a result, the Court provided guidelines to help determine whether character and propensity evidence is admissible at the penalty phase. The court held that evidence which establishes that the defendant, in the recent past, has engaged in criminal conduct involving violence to the person is highly probative of the defendant’s character and propensities. “On the other hand, the type of evidence that tends to inject arbitrary factors into a capital sentencing hearing usually is evidence which is of only marginal relevance to the jury’s determination of the character and propensities of the defendant.”
 
 Id.
 

 In
 
 State v. Cooks,
 
 97-0999 (La.9/9/98), 720 So.2d 637, the State introduced letters written by the defendant in “gang script” describing his violent threats against a cell mate from another gang and against innocent civilians outside the prison walls, including his former girlfriend. In addition, at the penalty phase, an expert on gang violence testified for the prosecution. The court noted that the expert’s testimony was “necessary and relevant to interpret the letters written by the defendant in which he threatens his cell mate,” and was “strong evidence to establish a relevant
 
 *255
 
 link between the defendant’s character, his sentencing, and evidence of his gang involvement.”
 
 Id.
 
 97-0999, p. 28, 720 So.2d at 650.
 

 In the instant case, both letters strongly suggest defendant’s bad character and propensities. The first letter, in which defendant implicitly admits to shooting Jessica Cooper, and expresses a desire to escape from jail and “finish the job,” is clearly relevant and admissible to prove defendant’s character. LSA-C.Cr.P. art. 905.2;
 
 Comeaux,
 
 93-2729 (La.7/1/97), 699 So.2d 16 (holding evidence which establishes Isithat the defendant, in the recent past, “has engaged in criminal conduct involving violence to the person is highly probative of the defendant’s character and propensities.”). Moreover, despite the fact that there is no evidence that defendant took any steps, beyond mailing the letters, to carry out the plans described, it seems clear that defendant’s statements in both letters are directly relevant to the defendant’s character and violent propensities, even while confined by the prison walls. Thus, they were properly admitted under the
 
 Cooks
 
 rationale. Accordingly, this claim lacks merit.
 

 Defense counsel also claims the State failed to give adequate notice of the letters before presenting them at the penalty phase. The State must give timely notice of unadjudicated prior offenses it intends to introduce during the penalty phase.
 
 State v. Jackson,
 
 608 So.2d 949, 957 (La.1992);
 
 State v. Hamilton,
 
 478 So.2d 128, 132 (La.1985). However, the record reveals that defense counsel was aware of the letters before trial began and actively sought to exclude them in a pretrial motion in limine. Specifically, defense counsel stated that they expected the State to introduce the letters but argued for their exclusion because they were irrelevant. Accordingly, defendant’s claim that there was a lack of notice is without merit.
 

 In defense counsel’s final claim relating to the letters, he argues that the State suppressed exculpatory evidence that suggested the letters were in fact evidence of defendant’s mental illness, and not evidence of his violent propensity. Defense counsel claims the State withheld statements from defendant’s daughter, Sydnee Odenbaugh, and Heather Aaron that indicated neither took the letter seriously and |62believed they showed defendant was insane. Specifically, Sydnee Odenbaugh told police, when discussing defendant’s claim that the surviving victim, Jessica Cooper, and Heather Aaron were visiting him in jail and were plotting against him, “That’s what he thinks. He’s insane.” Moreover, with regard to the same claim, Aaron stated defendant was “losing it ... because I’ve never had a problem with [him] at all, ever.” The State not only failed to disclose evidence that the police had investigated the supposed conspiracy to commit additional mayhem and determined on the basis of the opinions of Sydnee Odenbaugh and Heather Aaron that defendant was simply “losing it” or insane, but also failed to disclose to the defense counsel the defendant’s medical records from the More-house Parish Prison. As a result, jurors were denied evidence that the two prospective victims of the murder conspiracies were characters at the center of a delusional mental health crisis.
 

 In
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to the accused, after receiving a request for it, violates a defendant’s due process rights, where the evidence is material either to guilt or punishment, without regard to the good or bad
 
 *256
 
 faith of the prosecution.
 
 Id.,
 
 373 U.S. at 87, 83 S.Ct. at 1196-97. .For purposes of
 
 Brady's
 
 due process rule, a reviewing court determining materiality must ascertain “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.”
 
 Kyles v. Whitley,
 
 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
 

 | KjOn the other hand, the State does not violate the Due Process clause by failing to disclose evidence that is equally available or more so to the defendant.
 
 See United States v. Dula,
 
 989 F.2d 772, 775 n. 9 (5th Cir.1993). In the present case, we note that the statements of Sydnee Oden-baugh and Heather Aaron expressing their lay opinions that defendant was insane or “losing it” may not have been readily available to the defense, although it appears counsel had little difficulty in securing the statements in connection with the new trial motion, but the factual predicate for those opinions, the hard medical evidence that defendant may have been paranoid and delusional, appeared in his records in the Morehouse Parish Prison and Bastrop Mental Health, as to which he had ready access. The onus for failing to provide jurors with the proper factual context in which to evaluate the two letters, or in failing to provide Dr. Baker with the necessary information to reformulate the opinion he expressed during the penalty phase that defendant did not suffer from any mental illness, fell on the defense counsel and not on the State. This claim lacks merit.
 

 Victim Impact Testimony
 

 Defense counsel claims that the trial court erred by admitting victim impact statements despite inadequate notice from the State and a failure to hold a
 
 Bernard
 
 hearing. The penalty phase of a capital trial focuses on the circumstances of the offense, the character and propensities of the offender, and the impact that the crime has had on the victim, his or her family members, friends, and associates. LSA-C.Cr.P. art. 905.2. While limited, victim-impact testimony, which
 
 State v. Bernard,
 
 608 So.2d 966 (La.1992), defines as evidence of the character of the victim, evidence of the emotional, physical, and economic impact of the crime on the family of the murdered victim, excluding evidence of the survivors’ opinions of the crime and of the murderer, is admissible to show the character and propensities of the defendant and the circumstances of the crime.
 
 Bernard,
 
 608 So.2d at 967-68, 972. In
 
 Bernard,
 
 the Court stated that the use of victim-impact evidence requires pre-trial notice to the defense.
 
 Id.,
 
 608 So.2d at 972. The Court likened the notice required to that governing the admission of other crimes evidence, stating that upon its request, the defense counsel “is entitled to notice of the particular victim impact evidence sought to be introduced by the prosecutor and to a pretrial determination of the admissibility of the particular evidence.”
 
 Id.,
 
 608 So.2d at 973. Notably, although a trial court will frequently hold an evidentiary hearing to determine the admissibility of other crimes evidence, one is not always required.
 
 State v. McDermitt,
 
 406 So.2d 195, 201 (La.1981);
 
 State v. Hatcher,
 
 372 So.2d 1024, 1027 (La.1979). In
 
 State v. Bannister,
 
 95-2366 (La.App. 4th Cir.12/18/95), the court of appeal granted the defendant’s writ application and held that “[t]he defense is entitled to a hearing and pretrial determination of the admissibility of the victim impact evidence.” This Court reversed, granting the State’s application and holding that the State had satisfied the requirements of
 
 *257
 

 Bernard, State v. Bannister,
 
 96-0188 (La.3/2/96), 670 So.2d 1223, 1224.
 

 In the instant case, defense counsel complains that despite repeated requests, the State did not provide notice of intent to introduce victim impact statements during the penalty phase until shortly before trial. At that time, defense counsel filed a motion to suppress the statements due to an inability to investigate the claims. The 1 ¡⅞⅛⅛! court denied the motion, but did grant a request to allow defense counsel to examine the witnesses pretrial in order to help prepare a defense. Apparently, no hearing was ever held.
 

 During the penalty phase, one of the witnesses, Sondra Odenbaugh’s sister, Juanita Brannon, stated that as a result of the murders she had been hospitalized for post-traumatic stress disorder, manic depression, and suicidal tendencies. According to defense counsel, this testimony exceeded the bounds allowed under
 
 Bernard,
 
 and should never have been presented, given that no pretrial hearing, was held.
 

 As an initial matter, defense counsel did not object to the testimony, and so arguably, he waived any claim. LSA-C.Cr.P. art. 841. In any event, the statement by Brannon concerning the impact of the crime on her health, seems to fall within the bounds of acceptable testimony under
 
 Bernard. See Bernard,
 
 608 So.2d at 967-68, 972. Moreover, while the State arguably failed to give timely notice of the testimony, defendant was given the opportunity to question Brannon before trial, but failed to subpoena her. Finally, there is no evidence that this testimony, even if erroneously admitted, had any impact on the jury’s verdict, therefore the error is harmless.
 
 See State v. Frost,
 
 97-1771, p. 14 (La.12/1/98), 727 So.2d 417, 430 (admission of victim impact evidence which exceeds the scope of
 
 Bernard
 
 is reviewed under a harmless error standard). This claim fails.
 

 Defendant also complains that Harold Potter, husband, father, and grandfather of the victims, gave inappropriate victim impact testimony, when he stated, while recalling the events of the day, “Somebody told me what ambulance [my wife] was Ififiin. I opened it up and I put my hand on her leg. They made me get back.” Again, however, defense counsel did not object to the testimony, and so arguably waived any claim. LSA-C.Cr.P. art. 841. Moreover, the testimony does not appear to violate the limits of
 
 Bernard.
 
 This claim is also without merit.
 

 Miscellaneous
 

 Stun Belt
 

 Defense counsel claims that the trial court erred by ordering the defendant to wear restraints and a stun belt in front of the jury. Specifically, defense counsel argues that the trial court failed to hold a hearing to determine the belt’s necessity; that the visibility of the belt infringed on his presumption of innocence; and that it instilled fear in him, influencing his demeanor. Absent exceptional circumstances, a defendant before the court should not be shackled, handcuffed, or garbed in any manner destructive of the presumption of innocence or detrimental to the dignity and impartiality of the judicial proceedings.
 
 State v. Stephens,
 
 412 So.2d 1057, 1059 (La.1982);
 
 State v. Wilkerson,
 
 403 So.2d 652, 659 (La.1981). To find reversible error, the record must show an abuse of discretion by the court resulting in clear prejudice to the accused.
 
 Wilkerson,
 
 403 So.2d at 659.
 

 In the instant case, there is some dispute about the visibility of the restraints defendant wore. According to defense counsel, the stun belt created a bulge on
 
 *258
 
 his back visible to the jury, and the leg brace altered the way he walked in the court room. According to the State, however, neither restraint was visible. The State ^describes the belt as a five inch square box worn under defendant’s clothing that could not be seen by the jury, and the leg brace, which fit around his knee, was silent, unnoticeable, and did not alter how he walked.
 

 Defense counsel does not point to any portion of the record that indicates either restraint was visible to the jury. He only points to an affidavit from trial counsel that notes the leg brace altered his gait when he walked and an affidavit from a witness in the courtroom who stated the stun belt was visible underneath defendant’s clothing. However, even if these claims are true, defense counsel failed to show clear prejudice, therefore, we find that this claim fails.
 
 Wilkerson,
 
 403 So.2d at 659.
 

 As to his claim that the belt instilled fear in him and influenced his ability to express himself at trial, defense counsel admitted at trial that there is virtually no evidence to support this contention. Defense counsel raised this objection at trial, arguing the belt “represents a restraint on the mind in that it causes a person to be more afraid to express their emotions or being expressive in their testimony.” When asked by the court if there was any evidence to support this claims, counsel responded, “No. Other than it would be his own testimony.”
 

 Here, defense counsel again has failed to provide any proof beyond his own claims that the belt impeded his ability to testify. He only points to a comment from a witness claiming he appeared afraid to move and comments he allegedly made to a relative, in which he claimed he did not want tó make any mistakes for fear of being shocked.
 
 Id.
 
 at 981. Nothing in the record suggests his testimony was altered due the stun belt; accordingly, he fails to show the restraint caused clear prejudice. Thus, on Imthe showing made, defendant’s claim fails.
 

 Capital Sentence Review
 

 In the discharge of the duty imposed by the legislature to “review every sentence of death to determine if it is excessive,” LSA-C.Cr.P. art. 905.9, this Court will review the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury’s finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Louisiana Supreme Court Rule 28, § 1. In the present case, Rule 28 review demonstrates that defendant’s death sentence is not excessive.
 

 The trial judge has filed the Uniform Capital Sentence Report (“UCSR”) required by La. S.Ct. R. 28 § 3(a); however this Court had not received a Capital Sentence Investigation Report (“CSIR”) from the Department of Public Safety and Correction.
 
 See
 
 La.S.Ct.R. 28 § 3(b).
 
 [10]
 

 The UCSR and penalty phase testimony indicate that defendant completed his education through the 11th grade and was of average intelligence. He was 44 years old at the time of trial, and is the youngest of three children. His mother was alive at the time of trial, and testified during the penalty phase, and his father died of colon cancer in 2005. He is the father of twin daughters, Sydnee and Shelby, who were 17 | fi9years old at the time of trial, as well
 
 *259
 
 as two other daughters, Kelly, 26, and Melissa, 30, and one son Colby, 21 years old. Defendant worked mainly as a carpenter through his adult life. While he had several felony and misdemeanor arrests in his past, defendant had no convictions before the instant case. The UCSR notes -that a psychiatric evaluation was performed on relator, and it was determined that he could distinguish right from wrong and cooperate in his defense.
 

 Proportionality
 

 Although the federal Constitution does not require proportionality review,
 
 Pulley v. Harris,
 
 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana.
 
 State v. Burrell,
 
 561 So.2d 692, 710 (La.1990);
 
 State v. Wille,
 
 559 So.2d 1321, 1341 (La.1990);
 
 State v. Thompson,
 
 516 So.2d 349, 357 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case,
 
 inter alia,
 
 a sufficiently “large number of persuasive mitigating factors.”
 
 State v. Sonnier,
 
 380 So.2d 1, 9 (La.1979);
 
 see also, State v. Weiland,
 
 505 So.2d 702, 707-10 (La.1987). This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
 
 Sonnier,
 
 380 So.2d at 7.
 

 The State’s Sentence Review Memorandum reveals that since 1976, jurors in 17nthe Fourth Judicial District Court (Oua-chita and Morehouse Parishes) have recommended imposition of the death penalty only six times, five of which survived on direct appeal to finality.
 
 [11]
 
 The State points out that during the period between January 1, 1976 to January 1, 1985, the policy of the district attorney in that district was not to seek the death penalty on any first degree murder case if the defendant would plead guilty and agree to a life sentence. Consequently, during that period, there was only one first degree murder case that originated in that district in which the death penalty was sought.
 
 See, State v. Baldwin,
 
 388 So.2d 664 (La.1980) (defendant convicted of first degree murder of an 85-year-old female, and executed in 1984).
 

 None of the eases resulting in the death penalty in the Fourth Judicial District Court (“JDC”) stems from facts particularly similar to the instant case. Four of the cases,
 
 Baldwin, Tart, Anderson,
 
 and
 
 Duncan
 
 involved victims who were under the age of 12 or over the age of 65, and
 
 Prejean,
 
 involved the killing of a state trooper. A statewide review reflects that this Court has affirmed capital sentences in a variety of cases involving multiple deaths or when a defendant creates the risk of death or great harm to more than
 
 *260
 
 one person.
 
 State v. Wessinger,
 
 98-1234 (La.5/28/99), 736 So.2d 162 (ex-employee returns to restaurant, shoots three and kills two);
 
 State v. Robertson,
 
 97-0177 (La.3/4/98), 712 So.2d 8 (mixed-race couple stabbed to death in their home during an aggravated burglary);
 
 State v. Baldwin,
 
 96-1660 (La.12/12/97), 705 So.2d 1076 (defendant shot and killed his estranged wife and the three men who were with her at the time);
 
 State v. Tart,
 
 93-0772 (La.2/9/96), 672 So.2d 116 (defendant murdered his estranged girlfriend and severely wounded her mother);
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364 (ex-employee returns to restaurant, kills one employee and attempts to kill another);
 
 State v. Sanders,
 
 93-0001 (La.11/30/94), 648 So.2d 1272 (husband kills estranged wife and new boyfriend);
 
 State v. Deboue,
 
 552 So.2d 355 (La.1989) (murder of two children in an apartment defendants intended to burglarize). Because this Court has overwhelmingly upheld death sentences in such cases, the death sentence imposed in this case does not appear disproportionate.
 

 Moreover, this Court has observed that Louisiana juries appear especially prone to impose capital punishment for crimes committed in the home.
 
 See State v. Holmes,
 
 06-2988 (La.12/2/08), 5 So.3d 42;
 
 State v. Leger,
 
 05-0011 (La.7/10/06), 936 So.2d 108;
 
 State v. Blank,
 
 04-0204 (La.4/11/07), 955 So.2d 90;
 
 State v. Howard,
 
 98-0064 (La.4/23/99), 751 So.2d 783;
 
 State v. Gradley,
 
 97-0641 (La.5/19/98), 745 So.2d 1160;
 
 State v. Robertson,
 
 97-0177 (La.3/4/98), 712 So.2d 8;
 
 State v. Code,
 
 627 So.2d 1373 (La.1993);
 
 State v. Burrell,
 
 561 So.2d 692 (La.1990);
 
 State v. Perry,
 
 502 So.2d 543 (La.1986);
 
 State v. Wingo,
 
 457 So.2d 1159 (La.1984);
 
 State v. Glass,
 
 455 So.2d 659 (La.1984);
 
 State v. Summit,
 
 454 So.2d 1100 (La.1984);
 
 State v. Williams,
 
 490 So.2d 255 (La.1986).
 

 172Compared to these cases, it cannot be said that the death sentence in this case is disproportionate.
 

 CONCLUSION
 

 For the reasons assigned herein, defendant’s conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for cer-tiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and béen denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
 

 AFFIRMED.
 

 Retired Judge HILLARY J. CRAIN sitting ad hoc for Justice CLARK, recused.
 

 *
 

 Justice Clark recused, and Retired Judge Hillary J. Crain sitting ad hoc.
 

 [1]
 

 . According to the defendant’s past medical history, he suffered from the following conditions: leg, back, and abdominal pain; hepatitis; Crohn’s/Colitis; chronic fatigue; headaches-frequent; suicidal thoughts; and feelings of worthlessness.
 

 Dr. Rita Agarwal, a staff psychiatrist with Monroe Mental Health Center, reported that on March 6, 2007, the defendant visited his office often because he complained of hearing voices. As a result, Dr. Agarwal prescribed Klonopin and Xanax. On December 11, 2007, Dr. Agarwal examined the defendant using an "Abnormal Involuntary Movement Scale” and determined that he was completely “normal.”
 

 [2]
 

 . According to the Morehouse Parish Detention Center Sick Call Request reports, the following events transpired: on December 4,
 
 *230
 
 2006, the defendant was placed on suicide watch throughout the weekend because of his mental state; on December 11, 2007, the defendant informed nurses that "Jessica Cooper is here at this facility ... watching me on camera” and he was taken immediately to the Bastrop Mental Center; on February 14, 2007, the defendant was placed on suicide watch due to him writing a letter stating his plan of escape; on June 25, 2007, the defendant was reported as "acting strange,” i.e., "experiencing hallucinations;” and on March 11, 2008, the defendant refused to take his prescribed medicines.
 

 [3]
 

 . According to the Bastrop Mental Health Center records, on February 1, 2007, the defendant exhibited symptoms of depression, visual hallucinations, as well as paranoid thinking. On March 6, 2007, Bastrop Mental Clinic conducted a psychiatric evaluation, which revealed that the defendant was diagnosed with a depression disorder. As a result of the evaluation, the defendant was prescribed Celexa (to assist with anxiety, depression, and sleep) and Triavil (to assist with hallucinations and sleep). On July 6, 2007, the defendant admitted to hearing Jessica’s voice and having conversations with her on a daily basis. On August 7, 2008, the medical records indicated that defendant was discharged and no longer given medication even though defendant complained of having problems with: depression, sleep, loss of energy, anxiety, and hallucination. The doctor opined that the reliability of defendant's responses was sometimes questionable.
 

 [4]
 

 . Dr. E.H. Baker is a licensed psychologist, who testified concerning defendant’s mental health during the penalty phase, in support of a claim that the State had suppressed material exculpatory evidence in advance of trial.
 

 [5]
 

 . According to Dr. Baker’s report, “[a]fter a significant period of treatment with psychiatric medication, Mr. Odenbaugh’s crisis symptoms apparently abated somewhat and he was weaned off the medication." This observation suggests that when the psychologist first examined defendant in October, 2008,
 
 i.e.,
 
 just before trial, defendant may have been in remission as a result of the psychotropic medication and possibly competent to stand trial. However, Dr. Baker’s report further observes that he "was able to elicit detailed information from him regarding the hallucinations and delusions that he experienced pre-trial, and that he continued to experience through the time of trial and subsequent to trial.” Dr. Baker also noted that at the time he met with defendant on July 10, 2009, "he was still experiencing both delusions and hallucinations.”
 

 [6]
 

 . LSA-C.Cr.P. art. 795(C) provides:
 

 No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made
 
 *234
 
 outside of the hearing of any juror or prospective juror.
 

 LSA-C.Cr.P. art. 795 also prohibits the use of peremptory challenges based solely on the race of the juror.
 

 [7]
 

 . The Supreme Court appears to have streamlined the first step of the
 
 Batson
 
 analysis in
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), which made clear that a defendant may satisfy the prima facie requirement without demonstrating that more probably than not the prosecutor’s peremptory challenges reflect racial bias. A defendant must only make a showing sufficient to raise a reasonable inference of discriminatory intent.
 
 Johnson,
 
 545 U.S. at 170, 125 S.Ct. at 2417 (“We did not intend the first step to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirement of
 
 Batson's
 
 first step by producing evidence sufficient to permit the trial judge
 
 to
 
 draw an inference that discrimination has occurred.”).
 

 [8]
 

 . When discussing the jury questionnaire the following exchange occurred:
 

 [Counsel]: Yours say [sic] in a case in which the defendant is found guilty of mur
 
 *239
 
 der and is eligible for the death penalty, I will always vote to impose the death penalty-
 

 Bryan: That’s how I felt at the time. I mean, that's pretty — that’s cut and dried right there.
 

 Bryan: Well, I mean, when I did that I got — I really feel — I felt that way at the time. But when I think about it, I guess there could be situations where I'd have to consider that the death penalty might not be appropriate all the way. But I’m just telling you as truthful as I can.
 

 [Counsel]: Then you’ve got penalty of death is justified in all cases where more than one person has been killed by a criminal act. And you have, yes.
 

 Bryan: Yeah. Like somebody from a tower or something picking people off. That kind of thing.
 

 [Counsel]: So do you still feel that way that a penalty of death is justified—
 

 Bryan: In that particular situation, if they’ve killed several people. I can’t think of anything that would change that, any mitigating, aggravating or whatever legal term it is for it that would change my mind about that.
 

 [9]
 

 . This testimony indicates the defendant would impose the death penalty in an instance in which someone indiscriminately murdered numerous people while shooting from a tower. Clearly, those are not the facts of this case.
 

 [10]
 

 . The UCSR notes that not no Capital Sentence Investigation was ordered.
 

 [11]
 

 .
 
 State v. Anderson,
 
 06-2987 (La.9/9/08), 996 So.2d 973;
 
 State v. Duncan,
 
 99-2615, (La.10/16/01), 802 So.2d 533;
 
 State v. Tart, 92-0772
 
 (La.2/9/96), 672 So.2d 116;
 
 State v. Baldwin,
 
 388 So.2d 664 (La.1980);
 
 State v. Prejean,
 
 379 So.2d 240 (La.1979) (first degree murder occurred in Lafayette Parish, case transferred to Ouachita Parish on change of venue).
 

 In
 
 State v. Divers,
 
 94-0756 (La.9/5/96), 681 So.2d 320, the defendant was charged with two counts of first degree murder; convictions and death sentences reversed by this Court on grounds that the trial court erroneously denied cause challenges to the biased jurors who refused to consider any penalty other than death for the charged crime; state reduced charge to two counts of second degree murder on retrial; convicted as charged on both counts and sentenced to two consecutive life sentences.