ROSEMARY LEDET, Judge.
hln this criminal case, the defendant, Alfred Jones, appeals his conviction on two counts of first degree murder, in violation of La. R.S. 14:30, and the life sentence imposed on him on each count. His sole assignment of error is that the trial court erred in allowing the State to introduce other crimes evidence. Finding no error, we affirm.

STATEMENT OF THE CASE

In April 2007, Mr. Jones was indicted for the first degree murders of sixteen year old Damon Brooks and seventeen year old Ivan Brooks (the “Brooks Brothers”). At his arraignment, Mr. Jones pled not guilty. The trial court denied Mr. Jones’ motion to suppress identification. Following a Prieur[1] hearing, the trial court granted the State’s motion to introduce other crimes evidence — evidence that the gun used to kill the Brooks Brothers in February 2007 was the same gun used to kill Clifford Campbell in January 2007. After a twelve-day jury trial, Mr. Jones was found guilty as charged on both counts. Adopting the jury’s recommendation, the trial court sentenced Mr. Jones on both counts to life imprisonment at hard Rlabor without benefit of probation, parole, or suspension of sentence and ordered the sentences to run concurrently. This appeal followed.

STATEMENT OF THE FACTS

It is undisputed that on February 15, 2007, Mr. Jones shot and killed the Brooks Brothers. The issue at trial was whether he did so in self-defense. The crime scene was a vehicle driven by Darryl Kiefer; the Brooks Brothers were passengers in the vehicle. The vehicle was parked in the 1000 block of Kentucky Street in New Orleans. Immediately before the shootings, Mr. Kiefer gave Mr. Jones a ride to his girlfriend’s house. After he exited the vehicle, Mr. Jones shot all three occupants. The Brooks Brothers both died at the scene; Mr. Kiefer survived.
All three occupants of the vehicle — Mr. Kiefer and the Brooks Brothers — had *226 Young Fellows tattoos. Mr. Campbell, who was murdered in January 2007, likewise had a Young Fellows tattoo. The gun used to shoot the occupants of the vehicle was the same gun that was used to shoot Mr. Campbell. The trial court, as noted, granted the State’s Prieur motion to introduce evidence of Mr. Campbell’s murder at trial in this case.[2]
At trial, the State called the following ten witnesses: 1) Darryl Kiefer, 2) Giselle Roussell, 3) Benja Johnson, 4) Tarez Cook, 5) Ed Delery, 6) Regina Williams, 7) Lucinda Barnes, 8) Harold Wischan, 9) Kenneth Leery, and 10) Dr. Paul McGarry.
LD Darryl Kiefer
Darryl Kiefer was the driver of the vehicle and the surviving victim. He grew up with the two deceased victims, the Brooks Brothers, in the Treme area of New Orleans. After graduating from J.F. Kennedy High School (“Kennedy”) in 2005, he went to Belen College in Texas on a basketball scholarship. He only attended college there for one year.' In August 2006, he returned to New Orleans and attended SUNO. In November or December 2006, he dropped out of school. In the fall of 2006, he worked for Maximum Staffing Temporary Service and began selling marijuana.
Mr. Kiefer stored the money he earned and the money Louis Daniels — a drug dealer — earned at his house. He was friends with Mr. Daniels and knew him from junior high school. He also played basketball with him. Mr. Kiefer met the defendant, Mr. Jones, through Mr. Daniels. Mr. Kiefer was neither a friend of Mr. Jones, nor in business with him.
In December 2006, the money Mr. Kiefer stored at his house — his and Mr. Daniels’ money — was stolen. On the day it occurred, the Brooks Brothers, Hillary Campbell, and “Pookie” (a friend) met Mr. Kiefer at his house before going to play basketball. The Brooks Brothers and “Pookie” accompanied Mr. Kiefer to play basketball, but Mr. Campbell took the bus home instead. When Mr. Kiefer returned home from playing basketball, he discovered that the money was missing. He called Mr. Daniels and asked him if he had taken the money. Mr. Daniels denied doing so and came to Mr. Kiefer’s house. Mr. Daniels questioned Mr. |4 Kiefer regarding what had occurred. According to Mr. Kiefer, Mr. Daniels told him “Don’t worry about it, it’s going to come up”; and Mr. Daniels never discussed the incident with him again.
On the day of the shootings (February 15, 2007), Mr. Kiefer began his day in Thibodaux; and he went with his dad to therapy. After therapy, his dad dropped him off at the Brooks Brothers’ house because his car was parked near then-house. Later that day, Mr. Kiefer and the Brooks Brothers drove to “Tattoo Man’s” house in the Ninth Ward. After leaving “Tattoo Man’s” house, the trio drove through the Ninth Ward to say hello to Mr. Daniels. The people who were hanging out there told them that Mr. Daniels was not there. Mr. Jones was there, and he asked Mr. Kiefer for a ride to his girlfriend’s house, which was located about five minutes away. Mr. Jones got into the back passenger seat of Mr. Kiefer’s vehicle and gave Mr. Kiefer directions to his girlfriend’s house. Ivan Brooks was in the front passenger seat; Damon Brooks was in the back seat behind the driver, Mr. Kiefer.
When they arrived at Mr. Jones’ girlfriend’s house, Mr. Jones exited the vehicle *227 and stated: “Be cool.” Mr. Jones then pulled out a gun and shot at Mr. Kiefer and the Brooks Brothers. Mr. Jones shot Damon Brooks first. Mr. Kiefer was shot ten times; he was shot in the arm, leg, hands, and chest. After Mr. Jones fled, Mr. Kiefer called 911. Mr. Kiefer saw a woman coming out of a house and called out to her for help. When she failed to respond, he drove the vehicle forward to the front of the woman’s house. The woman ran inside stating that she was going to call the police. Shortly thereafter, the police arrived.
|sMr. Kiefer acknowledged that in 2009 he pled guilty to possession with intent to distribute marijuana and was sentenced to five years of probation. When he was arrested for the marijuana violation, there was a gun in the car in which he was riding. He also acknowledged that in July 2010 he was arrested for possession of ecstasy; he testified that there had been no discussions with the State about this open charge. Mr. Kiefer denied having a gun in his car on the date of the shootings (February 15, 2007).
Mr. Kiefer also denied murdering Mr. Campbell or having anything to do with Mr. Campbell’s murder. Indeed, he testified that he found out about Mr. Campbell’s murder (which occurred in January 2007) by reading about it in the newspaper. He also found out from the newspaper that Mr. Campbell had a Young Fellows tattoo. Mr. Kiefer testified that Young Fellows was a basketball team, not a gang. (As noted elsewhere, Mr. Kiefer, the Brooks Brothers, and Mr. Campbell all had Young Fellows tattoos.) Mr. Kiefer testified that the Brooks Brothers were not hustlers; they were not involved in anything illegal. On the other hand, Mr. Kiefer acknowledged that Mr. Daniels was a hustler and a drug dealer.

2) Giselle Roussell

Giselle Roussell, an assistant police communications supervisor, identified the tape of the 911 call received on the date of the murders.

3) Benja Johnson

Officer Benja Johnson of the New Orleans Police Department (“NOPD”) testified that he was one of the officers who first responded to the call reporting the | fishootings. When he arrived on the scene, Officer Johnson observed a white vehicle parked in the street with the passenger door open. When he approached the vehicle, Officer Johnson observed that all three of its occupants had been shot. Officer Johnson notified EMS and attempted to speak to the driver of the vehicle. The driver indicated that “Alfred” had shot them. The other two occupants, one in the front passenger seat and one in the back seat, had expired on the scene. Officer Johnson cordoned off the scene until the crime lab technicians arrived.

U) Tarez Cook

Tarez Cook, a NOPD crime lab technician, was called to process the crime scene. Ms. Cook photographed the scene, collected the evidence found at the scene, and prepared a crime scene report. Another crime scene technician prepared a sketch of the scene, which Ms. Cook identified. Ms. Cook also identified the photographs taken at the scene. No firearms were found on the victims or at the scene. Spent bullet casings were collected.

5) Ed Delery

Ed Delery, an expert in the field of latent print development and a member of the crime lab, processed the vehicle. Mr. Delery took photographs of the vehicle, searched it for evidence, and processed it *228 for latent prints. Nineteen latent prints were found on the exterior of the vehicle, and two latent prints were found in the interior of the vehicle.

6) Regina Williams

| ./Detective Regina Williams, who participated in the homicide investigation, testified that she was sent to check on the victim, Mr. Kiefer, who was transported to Elmwood Medical Center (“Elmwood”). When Detective Williams arrived at Elm-wood, Mr. Kiefer was being prepared for surgery. She spoke with Mr. Kiefer and the physicians treating him. Mr. Kiefer told her that “Alfred” shot him, that he knew Alfred from the Gallier Street area, and that he did not know Alfred’s last name. Mr. Kiefer also told him that he gave Alfred a ride to his girlfriend’s house, and when Alfred exited the vehicle he shot all three occupants. Mr. Kiefer described Alfred as dark-skinned, slender, tall, and having dread locks. Detective Williams recovered a spent bullet that fell out of Mr. Kiefer’s clothes during preparation for surgery. Detective Williams relayed all the information she obtained to Detective Lucinda Barnes.

7) Lucinda Barnes

Detective Lucinda Barnes testified that she was the chief homicide investigator in ⅛⅛ case. When she arrived on the scene, she learned that two victims were fatally shot and another victim was shot and transported to Elmwood. Detective Barnes spoke with the first responding officers; they advised her that the homicides occurred in the white vehicle that was on the scene. Detective Barnes observed spent casings near the residence at 1003 Kentucky Street; the vehicle came to rest at 1035 Kentucky Street. ■
The day after the shootings Detective Barnes met with the surviving victim, Mr. Kiefer, at Elmwood. Mr. Kiefer told Detective Barnes that “Alfred” shot him. | ^Detective Barnes then put together a photographic lineup and showed it to Mr. Kiefer. Mr. Kiefer identified Mr. Jones as the person who shot him and the Brooks Brothers. Mr. Kiefer also gave a statement to Detective Barnes about the shooting. Detective Barnes then obtained a warrant to arrest Mr. Jones for the first degree murders of the Brooks Brothers.
Detective Barnes also investigated Mr. Kiefer’s background. She discovered that Mr. Kiefer was a member of the Young Fellows. (As noted, Mr. Kiefer claimed Young Fellows was a basketball group, not a gang.) At that time (February 2007), Mr. Kiefer had no criminal record. Nor did either of the Brooks Brothers have a criminal record. No weapons were found on the victims or in the vehicle.

8) Harold Wischan

On January 3, 2007, NOPD Detective Harold Wischan was notified by Louisiana National Guardsmen, who were patrolling in the area of Press Drive, that they found the body of young man in a grassy area near some abandoned houses. (This area was devastated in August 2005 by Hurricane Katrina.) The victim was identified as Mr. Campbell. Eleven spent nine millimeter shell casings were found near the body. The victim had two five dollar bills and a plastic bag containing crack cocaine. The victim also had tattoos (one on each arm) identifying him as a member of the Young Fellows. Subsequently, Detective Wischan was contacted by Detective Barnes, who indicated that the spent eas-ings |flfound at his crime scene might match the spent casings found at the scene of the Brooks Brothers’ murders.

9) Kenneth Leary

Kenneth Leary, an expert in- firearms examination, testified that he examined the *229 casings and bullets from both the Brooks Brothers’ murders and Mr. Campbell’s murder and determined that the casings and bullets were fired from the same weapon.

10) Dr. Paul McGarry

Dr. Paul McGarry, a forensic pathologist, performed the autopsies on Mr. Campbell and the Brooks Brothers. Briefly, his findings as to each autopsy were as follows:
• Hillary Campbell: Mr. Campbell suffered eight gunshot wounds; six were in the back of the head, one went through the right shoulder, and one went into the right hip. Dr. McGarry recovered bullet fragments from the head and a whole bullet from the right hip.
• Ivan Brooks: Ivan Brooks suffered three gunshot wounds. One gunshot wound was to the top of the head; the bullet went downward and backward to the base of the brain. Another gunshot wound was to the back of the head about level to the victim’s ear; the bullet went into the head, hit the skull and went downward into the neck. The third gunshot wound was to the right upper back. The bullet went into the spine, damaging the spinal cord. Dr. McGarry found all three bullets in the victim’s body. Dr. McGarry opined that the brain injury was the fatal shot and that death would have occurred within minutes. Dr. McGarry further opined that the bullet wounds indicated that the victim was shot at close range. The wounds on the head and neck had stippling around them. He concluded that Ivan Brooks’ death was a homicide.
• Damon Brooks: Damon Brooks was also shot at close range, and he suffered two gunshot wounds to his head. Dr. McGarry testified that both of Damon . Brooks’s gunshot wounds had stippling around them. One bullet went downward through the brain to the base of the skull. The second bullet entered the neck and ended in the upper left back. Dr. McGarry found both bullets in the victim’s body. Dr. McGarry stated that the brain injury was | mf'atal, and the victim would have died within minutes. He noted that the weapon would have been aimed in the direction of the victim’s right side. Dr. McGarry also stated that both wounds were in a downward angle. Dr. McGarry concluded that Damon Brooks’ death was a homicide.
At trial, the defense called two witnesses: (i) Binatas Norman, and (ii) the defendant, Mr. Jones.

(i) Binatas Norman

Binatas Norman is the person that Mr. Jones was going to visit when Mr. Kiefer gave him a ride on the day of the shootings (February 15, 2007). Ms. Norman testified that Mr. Jones is the father of her son. She testified that in February 2007 she lived one block from the crime scene, the 1000 block of Kentucky Street.

(ii) Alfred Jones

Alfred Jones testified on his own behalf. He grew up in the Ninth Ward. He, like Mr. Kiefer, attended Kennedy, but he graduated from Douglass High School. He stated that Mr. Daniels and Mr. Kiefer played basketball together in school. Mr. Jones further stated that he, Mr. Kiefer, and Mr. Daniels were drug dealers. He knew that Mr. Daniels kept his money at Mr. Kiefer’s house. The money was kept in a cabinet that had a lock on it, and only Mr. Kiefer and Mr. Daniels had keys to the lock. One or two weeks before Christmas 2006, Mr. Kiefer contacted Mr. Dan *230 iels and told him that the money had been stolen. Mr. Jones was with Mr. Daniels when Mr. Kiefer contacted him by phone. Mr. Jones accompanied Mr. Daniels to Mr. Kiefer’s house. The back door to the house was off its hinges, and the cabinet was broken open. Mr. Kiefer told them that earlier | nthat day the Brooks Brothers and Mr. Campbell were at his house. Mr. Kiefer and the Brooks Brothers went to play basketball; Mr. Campbell went home. Mr. Kiefer discovered the money had been stolen when he returned from playing basketball.
After Mr. Jones and Mr. Daniels went to Mr. Kiefer’s house and Mr. Kiefer told them what happened, all three of them went to Mr. Campbell’s house. When they arrived, Mr. Kiefer went into the house by himself. He came out and told them that Mr. Campbell was not there. Mr. Kiefer then took Mr. Daniels and Mr. Jones home. Mr. Jones stated that Mr. Daniels thought that Mr. Kiefer had stolen the money because Mr. Kiefer had new rims on his car and was wearing a new gold chain. Mr. Daniels called Mr. Kiefer and told Mr. Kiefer that Mr. Jones had seen him with the new rims and gold chain. Mr. Jones stated that he did not know Mr. Campbell.
Mr. Jones further testified that he did not see Mr. Kiefer again until the day of the shootings, February 15, 2007. On that day, Mr. Kiefer was driving down Gallier Street and was stopped at a stop sign. Mr. Kiefer asked Mr. Jones if he had seen Mr. Daniels. Mr. Jones replied that he had not seen Mr. Daniels, but asked Mr. Kiefer for a ride to his girlfriend’s house. Mr. Jones got into the vehicle and gave Mr. Kiefer directions to the house. When they arrived at the house, Mr. Kiefer told Mr. Jones about the call he got from Mr. Daniels about the rims and chain. Mr. Kiefer asked Mr. Jones if he was saying that Mr. Kiefer stole the money. Mr. Jones said no. Mr. Kiefer then pulled out a gun and threatened to kill him. Mr. Jones reached for the gun and took it out of Mr. Kiefer’s hand. Mr. h2Jones then fell out of the car. The man in the back seat attempted to wrestle the gun away from him, and Mr. Jones shot him as Mr. Jones was falling out of the car. Mr. Jones stated that he did not know how many times he shot the weapon. He heard Mr. Kiefer and the two men (the Brooks Brothers) yelling to “get him, kill him.” After the shooting, he just ran. Three days later, Mr. Jones turned himself in after retaining an attorney. He denied any involvement in Mr. Campbell’s murder.
On re-direct, the State called one witness: Donald Hancock.

Donald Hancock

Donald Hancock, the telephone supervisor for the Orleans Parish Sheriffs Office, testified that his job is to monitor phone calls in the prison complex. All phone calls made by inmates are recorded and maintained. Mr. Hancock identified a CD recording of the phone calls made by Mr. Jones. Portions of these phone calls were played during the trial. The phone calls were between Mr. Jones and his mother, and Mr. Jones and a male friend, concerned whether they could get Mr. Campbell’s sister to testify that she believed that Mr. Jones was not involved in Mr. Campbell’s murder.

DISCUSSION

ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER 1

| isln his sole assignment of error, Mr. Jones contends that the trial court erred in allowing the State to introduce *231 evidence of Mr. Campbell’s murder. Before the trial, the State filed a Prieur motion alleging that the “evidence of the killing of Hillary Campbell has independent relevance to establish motive, intent, and plan on the part of Alfred Jones to preemptively assassinate the associates of Hillary Campbell before they found out he was involved in the murder of their friend.” As noted above, the evidence revealed that the same gun was used in Mr. Campbell’s and the Brook Brothers’ murders. Finding the evidence admissible, the trial court granted the State’s motion. At the beginning of the trial, the court instructed counsel on the limited scope of the admissible evidence regarding Mr. Campbell’s murder.
At trial, the State used the evidence of the prior murder to show that whoever killed Mr. Campbell had possession of the weapon on the day of the shooting. The State also used the evidence to show that Mr. Jones intended to shoot Mr. Kiefer and the Brooks Brothers. Mr. Jones also used the evidence of the prior murder to support his self-defense argument. Particularly, he testified that Mr. Kiefer had the gun and that Mr. Jones took it away from him in a struggle. Mr. Jones argued that he acted in self-defense because Mr. Kiefer was trying to kill him for one of two reasons: (1) Mr. Kiefer thought that Mr. Jones knew who stole the money, and Mr. Jones knew that he killed Mr. Campbell; or (2) Mr. Kiefer was going to kill Mr. Jones before Mr. Jones killed him because Mr. Kiefer thought that Mr. Jones had killed Mr. Campbell.
[UA trial court’s ruling on the admissibility of evidence is reviewed for an abuse of discretion. State v. Cosey, 97-2020, p. 13 (La.11/28/00), 779 So.2d 675, 684; State v. Wright, 11-0141, p. 7 (La.12/6/11), 79 So.3d 309, 316. This same standard applies to rulings regarding the admission of other crimes evidence. Wright, supra. The well-settled rule governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past. See State v. Hatcher, 372 So.2d 1024, 1035-36 (La.1979). Nonetheless, La. C. Evid. art. 404(B) authorizes the use of such evidence for other purposes including proof of motive or intent.[3]
Before other crimes evidence can be admitted as proof of intent three prerequisites must be satisfied: (1) the prior acts must be similar; (2) there must be a real and genuine contested issue of intent at trial; and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Kahey, 436 So.2d 475, 488 (La.1983).[4] To illustrate, in State v. *232 Blank, 04-0204 (La.4/11/07), 955 So.2d |1590, the State sought to introduce evidence that the defendant killed or attempted to kill the occupants of residences during the commission of aggravated burglaries. The Louisiana Supreme Court found that the evidence met the three requirements enunciated in Kahey. The Supreme Court reasoned that “the acts were similar, in that they each involved home invasions where defendant entered the home to steal money, was caught by the resident, each of whom were somewhat elderly, and then killed or attempted to kill the resident.” Blank, 04-0204 at p. 42, 955 So.2d at 125. The Supreme Court further reasoned that “specific intent was a genuine issue at trial, in that it is an essential element of the crime, and was contested.” Id.
The erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Oldenbaugh, 10-0268, p. 26 (La.12/6/11), 82 So.3d 215, 251. As the Louisiana Supreme Court recently noted:
An error is harmless if the jury’s verdict actually rendered at trial was “surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); cf. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988)(0’Connor, J.)(harmless-error analysis begins with the premise that the evidence admitted at trial is sufficient to support the verdict and asks whether the state can prove “ ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ”) (quoting Chapman v. California, 386 U.S. 18, 22-24, 87 S.Ct. 824, 828,17 L.Ed.2d 81 (1967)).

Id.

Applying the principles to the facts of this case, we find no error in the trial court’s ruling allowing the admission of evidence of Mr. Campbell’s murder. The evidence was used to show that Mr. Jones was not acting in self-defense and had a | Tfimotive for shooting Mr. Kiefer and the Brooks Brothers. Such is permissible under La.Code of Evidence article 404(B).
Mr. Jones admitted that he shot the Brooks Brothers but argued that it was in self-defense. Mr. Jones contended that Mr. Kiefer had the gun and pulled it out, threatening to kill him. Mr. Jones testified that he pulled the gun away from Mr. Kiefer and fired in self-defense. Mr. Jones suggested that Mr. Kiefer wanted to kill him because Mr. Jones knew that Mr. Kiefer had stolen the money and blamed it on Mr. Campbell. In fact, Mr. Jones used the admission of Mr. Campbell’s murder to argue that Mr. Kiefer had killed Mr. Campbell because Mr. Campbell knew that Mr. Kiefer had taken the money and blamed it on Mr. Campbell or that Mr. Kiefer knew that Mr. Campbell had taken the money.
Mr. Kiefer, however, testified that he did not have the weapon but that Mr. Jones pulled the gun out and started shooting at Mr. Kiefer and the Brooks Brothers. Mr. Kiefer’s testimony further suggested that Mr. Jones wanted to shoot them because he thought they suspected he was involved in Mr. Campbell’s murder.
In sum, the introduction of the evidence of Mr. Campbell’s murder and the fact *233 that both shootings involved the same weapon went to the issue of whether Mr. Jones was acting in self-defense. Whoever killed Mr. Campbell had the weapon in his possession and had a motive for trying to kill the other. Accordingly, the trial court did not err in allowing the State to introduce evidence of Mr. Campbell’s murder.
|17Even assuming the trial court’s evi-dentiary ruling was in error, the error would be harmless. Mr. Jones admitted that he shot at Mr. Kiefer and the Brooks Brothers in self-defense. However, Mr. Kiefer testified that Mr. Jones did not act in self-defense. Mr. Kiefer stated that Mr. Jones had the weapon and shot him and the Brooks Brothers after he exited the vehicle. Dr. McGarry’s testimony does not support Mr. Jones’s version of the incident. Dr. McGarry testified that the Brooks Brothers both were shot in the head, which wounds went in a downward motion. Ivan Brooks was also shot in the right upper back. These injuries indicate that the victims had their backs to Mr. Jones when they were shot. This testimony was sufficient for the jury to assess the credibility of the witnesses and accept the testimony of Mr. Kiefer that Mr. Jones was not acting in self-defense when Mr. Jones shot the Brooks Brothers.
This assignment is without merit.

DECREE

Accordingly, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. State v. Prieur, 277 So.2d 126 (La.1973).

. As discussed elsewhere, Mr. Jones’ sole assignment of error relates to the introduction of the evidence regarding Mr. Campbell’s murder.

. La. C. Evid. art. 404(B) provides:
Except as provided in Article 412 [regarding a victim’s past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

. See also State v. Williams, 96-1023, p. 30 (La.1998), 708 So.2d 703, 725-26 (evidence demonstrating that the defendant shot a man during a robbery just hours before the crime charged was admissible in a first-degree murder prosecution because evidence of the earlier shooting was relevant to show that the defendant intended to fire the gun at the *232 victim even though he claimed that the gun accidently discharged); State v. Jackson, 625 So.2d 146, 150 (La.1993)(quoting State v. Cupit, 189 La. 509, 179 So. 837, 839 (1938)(" ‘[when] the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act was committed.’ ”))